LYDICK *v.* THE B. & O. R. R. Co.

Decided December 18, 1880.

1880
Special Term.

Lydick
v.
The B. & O. R.
R. Co.

1. By the common law *choses* in action could not be transferred, but covenants real were an exception to this rule, and the right of action for the breach of such a covenant passes with the *legal* title of the real estate, with which such a covenant runs.

2. A parol contract, whatever is its character, can not at law run with land, but if a parol contract is of such a character, that it would, if it were a covenant, run with the land and be a covenant real, such parol contract will be regarded by a court of equity as running with the land, and it will at the instance of the party who owns the land and has acquired it under the covenantee, whether he hold the legal or equitable title, enforce specifically such contract.

3. A covenant real, when sued on by any other than the original covenantee, is not subject to any equities which might exist between the original parties to the covenant, but if a parol contract, which, if sealed, would be a covenant real, is sought to be specifically enforced in a court of equity by any party, though he be not the original promisee, the court will hold it to be subject to all equities which would exist between the original parties to the contract, and if such parol contract has been modified by them or by any parties subsequently entitled to the benefit of such contract, the court of equity will enforce it as modified, and only as modified.

4. *Quere:* Is privity of estate essential to the existence of a real covenant?

5. If some interest in land or a right of way or incorporeal hereditament issuing out of land is granted, and in the deed the grantee covenants with the grantor and his assigns that he will do something which concerns the land and becomes united to it, so that it affects the value of the land, in whosesoever hands it may come, such covenant runs with the land, and there is privity of estate between such covenantor and such covenantee.

6. A right of way through land is granted to a railroad company, and in the deed, as the consideration for such grant the railroad company covenants with the grantor, his heirs and assigns, to build and forever maintain a switch from said railroad to a mill on the land for the use of such mill. HELD:

This is a covenant real and runs with the mill.

7. If such grant of a right of way and contract for such switch were only verbal, such contract would in a court of equity be regarded as running with the mill, and its specific performance would be enforced in favor of any future owner of the mill holding title legal or equitable under the original covenantee.

8. If an intermediate owner of the mill had agreed to release the railroad company from building and maintaining such switch, and the company in consideration thereof had agreed to stop at specified times its freight-trains at the door of such mill for its accomodation, a subsequent owner could have this modified contract specifically enforced by a court of equity, but he could not sue upon it at law, but if such contract was made by the plaintiff instead of by an intermediate owner of the mill, he might sue upon it at law.

9. But if the contract made by the plaintiff was, that if the railroad company would so stop its trains, the plaintiff would dispense with the building and maintaining of the switch *only so long as it pleased the plaintiff*, he could not sue the railroad company on such contract to stop its trains, as it would not be supported by any consideration but be a *nudum pactum*.

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Marshall, rendered on the 3d day of July, 1878, in a suit in said court then pending, wherein Jesse Lydick was plaintiff and the Baltimore and Ohio Railroad Co. was defendant, allowed upon the petition of said defendant.

Hon. Thayer Melvin, judge of the first judicial circuit, rendered the judgment complained of.

GREEN, PRESIDENT, furnishes the following statement of the case:

The plaintiff, Jesse Lydick, in 1876 brought his action of *assumpsit* in the county court of Marshall county. His declaration was filed at June rules, 1876, and was as follows:

"*Jesse Lydick* v, *The Baltimore and Ohio Railroad Company*.

" In the County Court of Marshall County, West Va., June Rules, 1876.

" Jesse Lydick, the plaintiff in the above cause, complains of the Baltimore and Ohio Railroad Company, who have been duly summoned, &c., of a plea of trespass on the case on promises, for that, heretofore, to wit, on or about the year A. D. 1849, and before and after that date for a long period of time, Edward Hogan, who is now deceased, was then the owner in fee simple and occupier of a large tract of land comprising about four hundred acres of land, with a large flouring mill and other buildings thereon operated by water-power and machinery, situated in the county of Marshall and the State of Virginia, (now the State of West Virginia) three miles southeast of the town of Moundsville, and that about the years 1848 or 1849, a verbal contract was made and entered into by and between the said Edward Hogan and the said Baltimore and Ohio Railroad Company by Samuel Cameron, its duly accredited and authorized agent, to obtain and secure the right of way through Marshall county for said Baltimore and Ohio Railroad Company from the land owners through whose lands the said railroad was then located and constructed, or was designed thereby after so to be, and through which said railroad was afterwards located, constructed and has ever since maintained, by which it was expressly understood and agreed by and between said parties that the Baltimore and Ohio Railroad Company was to have the right of way, sixty-six (66) feet, for the location of their railroad and operations of their railroad business, and that in consideration thereof, and in compensation to said Hogan for said right of way, the said Baltimore and Ohio Railroad Company then and there promised to and agreed with said Edward Hogan to construct and maintain forever for the use and benefit of the said flouring mill and for the use and benefit of its then existing own-

1880
Special Term.
─────────
Lydick
v.
The B. & O.
R. Co.

ers and for the benefit of its future owner or owners, a railroad switch from the line of and connecting with said railroad to the door of said mill, for the shipment of freights to and from said flouring mill on said Baltimore and Ohio railroad ; and further, also, to construct and maintain two cattle-stops on or through said lands as a part of said contract. Plaintiff further avers the truth to be that afterwards Mr. Hogan, in consideration of the sum of $160.00 paid to him by the said railroad company, released the said company from that part of their contract relating to the two cattle-stops, and that in 1854 the Baltimore and Ohio Railroad Company did, in pursuance of and in execution of their aforesaid agreement with Mr. Hogan, contract and put down a switch near to said flouring mill and for the use and benefit but not extending down to it as first agreed upon, and the same was afterwards continued and remained there by said railroad company for the use and benefit of said flouring mill property for many years, to wit, until about the year 1869.

"Plaintiff further avers the truth to be, that said Hogan afterwards sold and conveyed all his land and the said mill property to his son-in-law, Joseph E. Bedillion, and Mr. Bedillion sold and conveyed to S. B. Purdy all of said land and mill property, and Mr. Purdy by executory and verbal agreement sold the mill-property, with its buildings and fixtures, comprising about four acres, more or less, to L. B. Purdy and J. E. Hogan, and said Hogan transferred his interest in said contract to S. B. Purdy, who afterwards, to wit: in 1872, sold to and delivered the possession thereof of all his interest in said mill property to Jesse Lydick, the plaintiff in this suit; and that S. B. Purdy's widow and heirs at law (after his death) ratified his verbal sale of said mill-property, and on February 24, 1875, made and delivered to plaintiff a deed in fee simple for said mill-property, and also transferred and assigned to Jesse Lydick, the plaintiff, all the advantages and benefits of the switch of the Baltimore

and Ohio railroad purchased by S. B. Purdy, deceased, from Joseph E. Bedillion, plaintiff being then and for some time previous thereto and now in possession of said mill property.

"Plaintiff further shows that in the fall of 1869 the frog was taken out of said switch by said railroad company, and they were unwilling to replace the same, as they alleged, on account of danger to running trains, and an agreement in writing by letter correspondence, which has since been lost or destroyed and cannot now be found, was made and entered into between Messrs. Purdy and Hogan, of the one part, and the Baltimore and Ohio Railroad Company, of the other part, by it, to wit, John L. Wilson, master of roads, its duly authorized agent in the premises, in substance as follows: In lieu of and as a substitute for the switch at the mill, the said railroad company agreed with Messrs. Purdy and Hogan to stop their way-train going each way two specified days of each and every week, to receive for shipment and to deliver freight at that point; and said parties of the first part agreed to that agreement so long as it suited them and no longer, and this agreement was made and entered upon by said parties and was continued by them as long as said parties of the first part, or either of them, continued to own or occupy said mill-property, and until about the year 1872, when Jesse Lydick, the plaintiff, purchased and took possession of the said mill-property.

" Plaintiff further avers the truth to be, that he became lawfully seized and possessed of said mill-property, to wit, about 1872, by purchase thereof from S. B. Purdy, the sole owner thereof, and that the same, with all the advantages and benefits of said switch, were conveyed to him by the widow and heirs at law of S. B. Purdy, deceased, by deed of February 24, 1875, and that after his purchase and possession of said mill-property, the defendant, although often requested so to do, wholly failed and refused to replace said switch at said mill-

property where it had formerly been, as it was their duty to do, or to stop their trains at that point pursuant to their agreement with Messrs. Purdy and Hogan, or to take on or put off freight of any kind for plaintiff to or from his mill-property aforesaid, or to afford him any advantages or benefits of any kind or any facilities of any kind for shipment to or from said mill-property on said Baltimore and Ohio railroad, and that in an interview relating to said switch-matter about that time had and held by and between plaintiff and Mr. Bradshaw, its duly authorized agent for said railroad company in the special premises, that Mr. Bradshaw stated to plaintiff that the company (thereby the Baltimore and Ohio Railroad Company) would not put the frog in under any consideration in the world; and that Mr. Charles A. Woodward, who was also a duly accredited and authorized agent of said railroad company in the special premises and in their employment, and who was there and then present, requested plaintiff to try flagging the trains again, with the express assurance then and there made to plaintiff by the said Charles A. Woodward, that the trains would be instructed and required to stop to receive and deliver freight at that point when signalled at that point by plaintiff, and that said C. A. Woodward promised to and did send plaintiff a suitable flag for that purpose.

"And plaintiff further says, that he did assent to such arrangement temporarily in lieu of and as a substitue for said switch so long as it suited him and no longer, if carried out by the said railroad company in good faith on their part, and afterwards as often as his business interests and wants required it, that he did with the flag sent him by said Woodward duly signal the proper trains of said railroad company to stop at the duly assigned and proper station near to said mill-property to receive for shipment for him and to deliver freight for him on said railroad; and that the said defendants afterward never did and never would stop their trains at that point

as they expressly undertook and promised him so to do in consideration of not immediately replacing said switch, and that said defendants, by their agents and servants conducting and operating the freight-trains on said railroad, did always afterwards wholly disregard all and singular of plaintiff's calls and signals to stop their said trains at that point or near to it, or to afford him any accommodations of any kind or any freights for shipment on the cars of said railroad company in anywise or in any direction from said mill-property, although often requested by the plaintiff so to do; and they replied to plaintiff that it was no station, and they would not stop their trains, or any of them, of any kind there, and never afterwards would or did so stop, save or replace or maintain said railroad switch at that point, but ever after did always wholly fail and refuse so to do although often requested by the plaintiff, to the plaintiff's damages, $499.00. Therefore, he sues, &c., &c."

On the 18th of July, 1876, the defendant appeared in the court and filed a general demurrer to this declaration and, the record says, to each count thereof. The plaintiff joined in the demurrer, and the same being argued was overruled by the court. At the November term of the court, to wit, on November 18, 1876, the defendant pleaded *non assumpsit*, and issue was joined. This issue was tried by a jury, who on November 23, 1876, found a verdict for the plaintiff and assessed his damages at $400.00; and thereupon the court on the same day rendered a judgment for the plaintiff against the defendant for this $400.00, the damages assessed by the jury, with interest thereon from November 23, 1876, till paid and his costs. During the trial of this cause the defendant took five bills of exceptions to the refusal of the court on its several motions to exclude certain evidence from the jury and to its refusal to grant several instructions asked by the counsel; and after the verdict was rendered and judgment entered, during the same term of the court, the defendant moved the court to set

aside the verdict and grant it a new trial, because the verdict of the jury was contrary to the law and the evidence. All the evidence given is certified by the court. The court overruled this motion, and the defendant excepted to this ruling of the court. It is unnecessary to state these various bills of exceptions or the evidence given on the trial of the cause, as by the record, on which we are to act, it is unimportant, whether these various exceptions were well taken or not.

A writ of error and *supersedeas* was awarded by the circuit court of Marshall county to this judgment of the county court on the petition of the defendant; and on the hearing the circuit court on August 8, 1877, reversed and annulled this judgment without stating on what ground it based its judgment, and gave a judgment for costs in favor of the defendant, and retained the case for trial in the circuit court, and gave the plaintiff leave to file an amended declaration. No amended declaration however was ever filed in the circuit court. The case was again tried by a jury on the issue of *non assumpsit,* which had been joined in the county court; and on October 4, 1877, the jury found a verdict for the plaintiff and assessed his damages at $499.00. The defendant moved the court to grant it a new trial, on the ground that this verdict was contrary to the law and the evidence. On July 3, 1878, the court overruled this motion and rendered a judgment in favor of the plaintiff against the defendant for $499.00, the damages found by the jury, and for his costs expended. An entry on the record states, that the defendant took a bill of exceptions to this ruling of the court and also bills of exceptions to certain other rulings of the court during the trial, which rulings are not specified, and that the court signed these bills of exceptions; but no bills of exceptions appear in the record, and none, it is presumed, were really signed. An amended declaration has been copied into the record by the clerk of the circuit court, which by its heading purports to have been filed in the county court

at June rules, 1876, when the original declaration was
filed, but there is nothing in the record to show, that
any amended declaration ever was filed either in the
county court or in the circuit court.

1880
Special Term.

Lydick
v.
The B. & O. R.
R. Co.

It is true, that at the foot of the copy of the original
declaration the circuit clerk has added this memorandum:
" (For continuation of this narr. see amended narr. on
page 39—Cl'k.)" It being doubtful whether this memo-
randum was made by the clerk of the county court in his
copy of the record when the case was taken to the cir-
cuit court or by the clerk of the circuit court, this Court
by *certiorari* brought before it the original copy of the
record as certified by the clerk of the county court to the
circuit court. From which it appears that this memo-
randum was not made by him nor did this amended dec-
laration appear in the copy of the record of the case in
the county court. The circuit court clerk also inserted
in the copy of the record this memorandum. "That the
final judgment of the circuit court had been made, upon
the inspection of the record of the county court, and it
appeared that this amended declaration was filed." It is
obvious therefore, that in making out this record the cir-
cuit court clerk obtained the original papers trom the
county court clerk's office and finding among them this
amended declaration copied it into the record, though it
was not in the copy of the record in his office. Of course
it constitutes no part of the record before us or before
the circuit court.

*Henry M. Russell,* for plaintiff in error, cited the fol-
lowing authorities:

13 W. Va. 202; 7 W. Va. 54; 4 Kent Com. 372,
373; 8 Barb. 645; 3 Ind. 289; 42 Mo. 545; 11 Mee. &
W. 641; 14 Conn. 12; 2 Man. Gr. & S. 548; 13 Pick.
284; 11 W. Va. 276.

*O. L. Holliday* and *McConnell & Meighen,* for defend-
ant in error cited, the following authorities:

Chit. Cont. (11th Am. ed.) 49 & note M. and cases cited;
2 Rand. 442 ; 7 W. Va. 54 ; 2 Call 22 ; 7 Leigh 147 ; 3
Rand. 448 ; 1 Chit. Cont. 46, 47 note M. ; *Id.* 29 note
E. ; 2 Rand. 442 ; 6 Munf. 406 ; 2 Pen. & W. 531.

GREEN, PRESIDENT, announced the opinion of the
Court :

The only question presented by the record in this
case is : Was the declaration in this case fatally defec-
tive on general demurrer ? In considering this question
we must determine, what was the character of the con-
tract made by Edward Hogan with the defendant, that
in consideration of his granting it a right of way
through his farm it would construct and maintain for-
ever for the use and benefit of a mill on his farm and
for its present and future owners a railroad switch con-
necting its road with the door of the mill. We will first
consider what would have been the character of this
contract, had it been instead of a verbal a written con-
tract under seal. · Would it have been a real covenant
or merely a personal covenant; that is, would it have
been a covenant [running with the land, that is, one
which enured to the benefit of all subsequent owners of
the mill, and for the breach of which any subsequent
owner might bring an action of covenant against the de-
fendant, or was it a mere personal covenant, for the
breach of which no one could ever sue except Edward
Hogan ? If this contract was personal and did not
enure to the benefit either in law or equity of any grantee
of this mill, it is obvious, that the case stated in the
declaration is one on which the plaintiff can base no suit.

Syllabus 4.

The counsel for the defendant in error insist, that it
is necessary to the creation and existence of a real cove-
nant, that there should be a privity of estate between
the parties. 4 Kent Com. 11th ed. pp. 472, 473. This
view of Chancellor Kent is by no means undisputed.
Highly respectable authorities hold, that a stranger may
covenant with a land-owner in such a manner as to at-

tach the *benefit* of the covenant to the land and have it
run with it in favor of any one who may become the
owner thereof. This can only be done however accord-
ing to these authorities, when the covenant is to do some
act for the benefit of the estate and upon the land itself.
Washburne in his treatise on real property, book 2, p.
15, vol. 2, p. 262 of 3d ed. says, that these views are
advocated by the editor of the American edition of
Smith's Leading Cases, 1 Smith's Lead. Cas. 5th Am. ed.
124, 140 *et seq*; that they are favored by the English
commissioners upon real property ; 3d Rep. of Eng. Com.
52, and is assumed to be law, per Jewett, Judge, in *Allen*
v. *Calver*, 3 Denio 284, 301, and by Judge Moncure in
*Dickinson* v. *Hoomes's adm'r et al.*, 8 Gratt. 353, 403.
To sustain these views reference is also made to *Paken-*
*ham's Case*, year book 42 Edward III, 3 pt. 14, fully
stated in 2 Sug. Vend. (6th Am. from 10 Eng. ed.) 473,
which case is commonly known as the *Prior and Con-*
*vent Case*, and also to Coke's opinion, Co. Lit. 384 b.
See also Rawle Cov. 335, and *Keppell* v. *Bailey*, 2 Myl.
& K. 517, 539. But Washburn himself agrees with
Chancellor Kent, that it requires a privity of estate to
give one man a right to sue another, where there is no
privity of contract between them.

It is not necessary in this case to determine, which of
the views is sound. For in the case before us the requi-
site privity of estate exists according to the views of
Washburn, who holds such privity to be necessary. He
says :- (Wash. on Real Property, vol. 2, pp. 262, 263, 3d
ed.) " Where one, who makes a covenant with another
in respect to land, neither parts with nor receives any
title or interest in the land at the same time with and as
a part of making the covenant, it is at best a mere per-
sonal one, which neither binds his assignee, nor enures
to the benefit of the assignee of the covenantee, so as to
enable the latter to maintain an action in his own name.
It is not easy to define in a few words what is meant in
all cases, by the expression ' privity of estate.' But it is

apprehended, that in the matter of a covenant running with land the language of Wilde, Judge, in *Hurd* v. *Curtis*, furnishes a sufficient clue. There the respective parties owning *independent* estates entered into certain covenants with each other as to kinds of wheels they should respectively use in their several mills. The grantee of one of these estates was sued by the covenantee, who had retained his estate, for breaking the covenant in the use of wheels in the granted estate. Wilde, Judge, said: ' We are of opinion, that this action cannot be maintained, as there was no privity of estate between the contracting parties. Their estates were several, and there was no grant of any interest in the real estate of either party, to which the covenant could be annexed.' (19 Pick. 459, 464). So where one of two adjacent owners of land covenanted with the other, that if he would erect a party-wall between their estates, the former would pay the latter for one half of it whenever he should use it, it was held to be a personal covenant, and not to run with the land, so as to bind the purchaser of the covenantor's land who should erect a building against the party-wall. (*Block* v. *Isham*, 16 Am. Law Reg. 8; *Weld* v. *Nichols*, 17 Pick. 543.) But it is not necessary to create the relation of feudal tenure between the covenantor and covenantee, in order that a covenant should run with the land (*Van Renssalaer* v. *Read*, 26 N. Y. 578). And a covenant may run with a rent, as with the land itself. Where one granted land to a railroad company for the purposes of their road, and covenanted for himself and his assigns to fence it and to keep it fenced, it was held to be a covenant which ran with the land and bound his grantee. *Demarest* v. *Willard*, 8 Cow. 206; *Willard* v. *Tillman*, 2 Hill 274.

\* \* \* \* \*  But if one simply covenants with a stranger to build a house or repair a mill-dam, it is not easy to see how it can be other than a personal covenant, or how it can make any difference in its character in

that respect, whether the act is to be done upon the covenantee's land or that of a stranger."

1880
Special Term.

Lydick
v.
The B. & O R.
R. Co.

It is unnecessary for us to determine, whether this would in the case put by Washburn make a difference, as some eminent lawyers insist; for in the case before us the defendant was not a stranger, but as a part of the contract claimed to run with the land and by this contract received an interest in the land, a right of way over it for its road, which obviously according to the views of Mr. Washburn made a privity of estate.

Mr. Washburn on page 263, vol. II of this work says: " It is conceived in accordance with this idea that such covenants and such only, run with land as concern the land itself, in whosesoever hands if may be, and become united with and form part of, the consideration for which the land or some interest in it is parted with, between the covenantor and covenantee."

This I apprehend is true, when the covenant is on the part of the grantor; but if the covenant is on the part of the grantee of an interest in the land or a right of way over it, or an incorporeal hereditament issuing out of it and the covenant concerns the land in whosesoever hands it may be, and becomes united with it, so that whenever sold it must enter into the consideration and enhance the price, such covenant is real and runs with the land. In such case there is privity of estate between the parties. Thus it was held in *Savage* v. *Mason*, 3 Cush. 500, that a covenant in a deed of partition between tenants in common, which provided that party walls might be erected on the dividing lines between their shares, and each would pay one half of the expense of every such wall before using it, was for the benefit of the land, and would pass as such, both as to the right conferred and the obligation imposed, to all persons claiming by descent or assignment under the original parties to the deed the court says at page 505 :

" The covenant can by no means be considered as merely personal or collateral and detached from the

Syllabus 5.

land. There was a privity of estate between the contracting parties in the land to which the covenant was annexed. The covenant is in terms between the parties and their respective heirs and assignees; it has direct and immediate reference to the land; it is beneficial to the owner as owner and to no other person; it is in truth inherent in and attached to the lands, and necessarily goes with the land into the hands of the heirs or assignee."

This case in connection with the case of *Block* v. *Isham*, 16 Am. L. Reg. 8, referred to in 2 Wash. 263 above quoted, illustrates well what is meant by privity of estate. For according to Washburn, "if one of two adjacent owners of land covenanted with the other, if he would erect a party wall, the former would pay the latter one half of it whenever he should use it, it was held to be a personal covenant, and not to run with the land, so as to bind the purchaser of the covenantor's land, who should erect a building against the party wall." It would be otherwise, we have seen, if the parties had been tenants in common and such covenant was made in the partition, for then the requisite privity of estate would exist between the parties. See also *Wild* v. *Nichols*, 17 Pick. 543. So a covenant by the grantee of one parcel of land for the benefit of other adjacent land of the grantor will pass to a subsequent assignee of the latter tract and may be enforced by him against the original covenantor. It is a covenant running with the land. See *Woodruff* v. *The Trenton Water Power Co.*, 2 Stock. Ch. 489. If the covenant had been made by the grantee of a right of way as in the case before us, and was for the benefit of an adjacent mill owned by the grantor, it is obvious such a covenant would on the authority of this case run with the land; for a covenant will run with an incorporeal hereditament such as rent or a right of way as with the land itself. See *Bailey* v. *Wells*, 3 Wilson 26; *Morse* v. *Aldridge*, 19 Pick. 449. This is admitted by Washburn. See 2 Washburn on Real Property 263.

So in *Sharp* v. *Waterhouse*, 7 El. & Bl. 816; (Eng.

Com. L. R. vol. 90, p. 815.) Where the owners of a mill by a deed, wherein they were granted the privilege of draining refuse on the land of another, covenanted to supply pure water for the consumption of the horses, &c., of the owners for the time being of this land, it was held, that this was a covenant running with the land.

1880
Special Term.

Lydick
v.
The B. & O. R.
R. Co.

Syllabus 6.

In *Murray* v. *Jayne*, 8 Barb. 613, certain commissioners were authorized by a statute to drain certain drowned lands in Orange county, and to tax the owners of such drowned lands to raise the funds necessary. They were also authorized to procure a right of way for a canal through any land for this purpose on compensating the owner; the amount to be paid the owner for such right of way to be agreed upon by the owner and the commissioners to be ascertained in a manner prescribed by the law. The commissioners opened a canal through the land of a person, which land covered in part these drowned lands and was liable to taxation. The owner authorized the commissioners to open the canal, it being agreed, that in consideration thereof they would not tax his land, till it was ascertained what was a just compensation for the right of way for the canal, and that these taxes should be deducted from the amount of the land-owner's compensation for the right of way of the canal. The court held, that had this agreement been under seal, it would have been a covenant running with the land.

This differs but little from the case before us on this point. The agreement by the railroad company in consideration of a right of way through the farm of Edward Hogan to make a switch to his mill-door on the farm establishes a privity of estate between the parties to the same extent, that the agreement in this New York case established such privity of estate; and the character of the covenant in the case before us was more obviously for the benefit of any owner of the mill, than was the character of the covenant for the benefit of the land in the New York case. We are therefore of the opinion,

1880
Special Term.

Lydick
v.
The B. & O. R.
R. Co.

Syllabus 1.

Syllabus 2.

that if this agreement between Edward Hogan and the defendant had been under seal, it would have been a covenant running with the land.

By the common law no *chose* in action could be assigned; and this general rule applied to parol contracts as well as to covenants. To this rule there were two exceptions. Among parol contracts a bill of exchange could be assigned or transferred. But to constitute a bill of exchange two things were essential, first, that it should not be under seal, and secondly, that it should be an unconditional order for the payment of money and nothing else. So there was one species of contract under seal, which at common law could be assigned or transferred, that is, a real covenant. It too was required to have certain requisites, which were absolutely necessary to its being a real covenant. It must affect land, that is, tend to increase or diminish its value in the hands of its owner, and it must be under seal, as its very name imparts. A covenant real is assigned or transferred by the transfer of the legal title of the land to which it is attached. See *Randolph's adm'r* v. *Kinney, &c.*, 3 Rand. 396. No transfer of the equitable title could have the effect in a court of law of transferring a covenant real to the equitable owner. See *Beardsley* v. *Knight*, 4 Vt. 471; *Van Court* v. *Moore*, 26 Mo. 92. Of course a parol contract cannot be a covenant real, and therefore it can not run with the land, and can not therefore be sued on in a court of law by the grantee of the land which it affects. See *Murray* v. *Jayne*, 8 Barb. 612; *Beckford* v. *Parrins*, 5 C. B. 920; *Parish* v. *Whitney*, 3 Gray 576.

But wherever the nature of the agreement is such, that it would have passed with the land, had it been sealed, subsequent purchasers of the estate to which it relates, who are substantially and beneficially interested in its performance, may enforce it in equity. *Murray* v. *Jayne*, 8 Barb. 612. This is done upon the principle, upon which courts of equity recognize and enforce the rights

of the assignee of a parol contract, though it be not a
bill of exchange, which alone was transferrible at law.
And so a court of equity would recognize the equitable
owner of lands to be entitled to the benefit of a cove-
nant real running with the land or to a parol contract,
which, if sealed, would amount to a covenant real.

In the case of *Murray* v. *Jayne*, 8 Barb. 612, the facts
of which we have heretofore stated, the court being of
opinion, that the parol contract of the commissioners
not to tax plaintiff's land in consideration of the right
of way granted by the grantor of the plaintiff to these
commissioners, if it had been put in the form of a cove-
nant, would have been a covenant real running with the
land, and the grantee of the land was therefore entitled
to the benefit of it in a court of equity, though not at
law. The court therefore specifically enforced this ver-
bal contract at the instance, not of the party with whom
the contract was made, but at the instance of the grantee
of the land for whose benefit this verbal contract was
made.

Upon the authority of this case it is clear, that a ver-
bal agreement, made by a railroad company to build and
maintain a switch to a mill on a tract of land in consid-
eration of a right of way for the road through such tract,
would be specifically enforced in a court of equity at the
instance of a subsequent owner of the mill, who had an
equitable or legal title derived from the original promisee.
It is also clear, that no action would lie on such verbal
agreement by such subsequent owner of the land.

As a bill of exchange or other negotiable paper in the
hands of an assignee is free from the equities, to which
it was liable before assignment, so covenants running
with land, when in the hands of a grantee of the land,
are free from the equities which may have existed against
the original covenantor. Thus in *Saydum* v. *Jones*, 10
Wend. 180, an agreement between the grantor and
grantee, that the grantee should be liable for the pay-
ment of a mortgage, which the grantor had executed,

was held inadmissible in an action brought against the the covenantor on his covenant of warranty by a subsequent grantee of the land, who had been evicted. So in a like action the covenantor can not reduce his liability by showing that the consideration paid for the land was less than that expressed in the deed, though this might be done, if the suit on the warranty had been brought by the original grantee of the land, (see *Green-vants* v. *Davis*, 4 Hill 643) ; but while such is the rule with reference to the equities between the original covenantor and covenantee, yet the effect of an actual release by a covenantee would be to bar a common law action brought by his grantee, who acquired the land after such release. See *Littlefield* v. *Getchell*, 32 Minn. 392. It is, however, questionable whether in this country under our registry acts a purchaser of the land could be deprived of any right, which appears on the face of his title papers, by a release not recorded and not made known

to him. See *Field* v. *Snell*, 4 Cush. 50. Be this as it may, it would seem that if there was no original covenant running with the land, but only such a verbal contract as would, had it been put in the form of a covenant, been a covenant running with the land, though a court of equity would enforce specifically such a parol agreement, at the instance of any future owner of the land, yet as his right in such a case would be a mere equity, it would be subject to a superior equity prior in time, which existed between the original parties to the agreement, and if they had set it aside by contract made before the land was conveyed to the purchaser, he could not enforce it, and if modified by the original parties by contract before the conveyance to the purchaser, he could in a court of equity only enforce it in its modified form. These conclusions follow from the subsequent purchaser having only an equitable and not a legal right, when the original contract affecting the land was a mere verbal contract.

Having reviewed most of the law bearing on points

1880
Special Term.

Lydick
v.
The B. & O. R.
R. Co.

presented in this case we will now consider the direct question involved in the case, that is: Ought the declaration in this case to be considered as presenting a case, on which the plaintiff has a right to recover? The declaration is obviously very inartificially drawn. A very large portion of it is surplusage. Throughout it there is set forth at considerable length that, which is merely evidence, in violation of the rule, that whatever is alleged in pleading must be alleged with certainty. See Stephens on pleadings, Tyler's ed. of 1872, from 2d London ed., p. 310. So there is stated unnecessarily matter, of which the court takes notice *ex officio*. *Idem* 312. The rule, that surplusage is to be avoided, is violated in a great variety of ways in this declaration. It sets out uselessly the provision of the contract between Edward Hogan and the defendant in reference to the two cattle-stops, as the violation of this part of the contract is not complained of. See *Idem* 364. It sets out uselessly the reasons assigned by the defendant, why it was unwilling to maintain the switch according to its contract, and various conversations between the plaintiff and defendant's agents. It also sets forth uselessly the names of the various agents of the defendant, who made certain contracts and their authority to make such contracts instead of stating the contracts according to their legal effect as made by the defendant. It is true, that surplusage is and never was a subject of demurrer according to the maxim *utile per inutile non vitiatur*. *Idem* p. 365. But to combine with the requisite certainty and precision the greatest possible brevity is now justly considered as the perfection of pleading. The evils, which result from a violation of the rule, that surplusage is to be avoided, are well set forth in the fourth volume of Minor's Institutes, pp. 363, 365. The rule, that pleadings must not be ambiguous or doubtful in meaning, is repeatedly violated in this declaration, thus in one part it is alleged, that "said Hogan (meaning I presume J. E. Hogan) transferred his in-

terest in said contract to S. B. Purdy." The only contract previously spoken of. was the contract of the defendant to make and maintain the switch, yet I presume that what it was intended to assert was, that J. E. Hogan transferred his interest in the land to S. B. Purdy. So though there are two Hogans and two Purdys named in the declaration, yet in setting out the very contract sued on, it is indefinitely stated to have been made by the Messrs. Purdy and Hogan. Such defects as these may sometimes justify a general demurrer ; and the first of these ambiguties which I have pointed out would probably vitiate this declaration, if the case probably intended to be stated would sustain the plaintiff's action.

The declaration also violates the rule against duplicity. See Stephens's Pleadings, p. 242. The declaration sets out in one count two several causes of action, one on the contract made by the defendant with Edward Hogan, and the other, on the contract made by the defendant with S. B. Purdy and J. E. Hogan. This defect, it is true, could not now by reason of our statute be taken advantage of by demurrer, but so objectionable is it, that Minor in his Institutes regrets the passage of such statutes. See Minor's Institutes, vol. 4, p. 939.

Other defects might be pointed out in this declaration, but as we desire to dispose of the probable case intended to be stated by the plaintiff, and thus terminate the litigation, I will set forth what I presume was the plaintiff's case, as intended to be stated in the declaration, and consider, whether as so stated it be a case in which he is entitled to recover.

In 1848 one, Edward Hogan, was seized in fee simple of a tract of land of four hundred acres in Marshall county, on which was a flour-mill, when he made a verbal contract with the defendant, whereby in consideration of Edward Hogan, giving it a right of way for its road through this farm it agreed with him to construct and maintain forever for the use and benefit of said mill for the use of its existing and future owners a

railroad switch on said land from said railroad to the door of the mill for the shipment of freight to and from this mill over said railroad.

Said Edward Hogan on July 13, 1859, conveyed this tract of land to S. B. Purdy, who by a verbal contract for a valuable consideration paid to him, agreed to sell the said mill and four acres of land attached, including the ground on which said switch was to be built, to L. B. Purdy and J. E. Hogan and put them in possession thereof. They having an equitable title to this mill and four acres of land in 1869 made a parol agreement with the defendant, whereby it agreed in lieu of and as a substitute for said switch to stop their trains going each way on two specific days of each week, to receive for shipment and deliver freight at said mill. The consideration for this agreement was a promise on the part of the said L. B. Purdy and J. E. Hogan to dispense with the building and maintaining of said switch by the defendant for so long a time as they, L. B. Purdy and J. E. Hogan, please, and no longer. Afterwards J. E. Hogan sold for a valuable consideration his undivided moiety of the equitable fee simple in this land to his co-tenant, L. B. Purdy, and in 1872 he sold the equitable fee simple in said mill and four acres to the plaintiff. In 1875 the widow and heirs at law of S. B. Purdy, deceased, who then held the legal title of said mill and four acres, conveyed it to the plaintiff. The plaintiff, after he became the fee simple owner of this mill and four acres, assented to the contract, which had been made by the defendant with L. B. Purdy and J. E. Hogan as a temporary arrangement in lieu of the switch and to continue only during his pleasure, and the defendant renewed its promise made to them. But the defendant refused to build or maintain this switch, or to stop its trains at said mill to take on and put off freight, as required by the last named contract. Therefore the suit was brought.

We have stated the whole substance of this declaration

in more detail, than it would have been necessary to state it, if had been formally and correctly pleaded; and yet it has occupied only about one fourth of the space taken by the declaration actually filed.

It is obvious, from what we have before said, that, so far as the plaintiff's claim is based on the original verbal contract made by the defendant with Edward Hogan, he cannot recover in this action, as this verbal contract could not at law run with the land. But it is also clear from the law as above stated, that the plaintiff would have a right to ask a court of equity to specifically enforce this verbal contract, because if it had been put in the form of a covenant, it would have been a covenant real running with the mill, and as the owner of it deriving his title from the original covenantee he would have been entitled to the benefit of such covenant. Of course his right to ask for the specific execution of this verbal contract made by the defendant to maintain this switch would have been lost, if he had made a valid verbal contract with the defendant, whereby it was bound in lieu of the maintenance of this switch to stop its trains twice a week at the plaintiff's mill to take on and put off freight. But if such contract had been made, the plaintiff could successfully maintain his action of *assumpsit* at law for the breach of such contract. And if such a valid verbal contract had been made by L. B. Purdy and J. E. Hogan, while they were the equitable owners of this mill, the plaintiff could have had such valid verbal contract by the defendant to stop its trains twice a week at his mill specifically enforced; but he could not have brought an action of *assumpsit* upon such contract, because it was not made with him.

It was however such a contract, that, if it had been put in the form of a covenant, it would have run with the land, and therefore on the principles which we have stated he could have had it specifically enforced. And as we have seen, that a previous owner of the land had a right to modify the original verbal contract, and this

modification would be binding on the plaintiff, whether he assented to it or not, and being binding on him and on the defendant, his assenting to it afterwards would be no consideration, upon which the defendant could be bound by its promise to him, so that it could be sued thereon at law, though it might have been enforced to perform this promise made to the previous owners, if made on a valuable consideration. The plaintiff could not therefore recover in an action of *assumpsit* on the verbal promise of the defendant made to the previous owners of this mill, L. B. Purdy and J. E. Hogan, even though it had been a valid promise sustained by a valuable consideration, nor on the renewal of such promise made to the plaintiff himself. He could only recover on a promise made to himself by the defendant on a valuable consideration. Had the defendant promised the plaintiff to stop its trains twice a week at his mill to carry off or deliver freight in lieu of the building and mainteinance of the switch, the plaintiff could have recovered in *assumpsit*. For the surrender by the plaintiff of his right to compel in equity the defendant to build and maintain such switch would have been a valuable consideration, which would sustain the contract.

It is well settled, that the compromise of even doubtful rights, whether legal or equitable, and their surrender would be a valuable consideration, which will sustain a promise, and of course the compromise of a valid claim and its surrender would be a valuable consideration, though the surrender of a claim which was clearly wrong would not be (according to some of the authorities at least), but perhaps even the surrender of a claim clearly wrong might be a valuable consideration, if such claim was *bona fide* believed by the plaintiff to be a valid claim. See *Longridge* v. *Dorville,* 5 B. & A. 117; *Kerr* v. *Lucas,* 1 Allen 280; *Moon & McClun* v. *Fitzwater,* 2 Rand. 442; *O'Keson* v. *Barclay,* 2 Pen. & Watts 531; *Allen* v. *Backhous,* 3 M. & W. 652; *Stapleton* v. *Stapleton,* 1 Atkins 10; *Morey* v. *Newfane,* 8 Barb. 645; *Ed-*

1880
Special Term.

Lydick
v.
The B. & O. R.
R. Co.

Syllabus 9.

*wards* v. *Burgh*, 11 M. & W. 641; *Jarvis* v. *Sutton*, 3 Porter 292; *Wilbur* v. *Crane*, 13 Pick. 289; *Long et al.* v. *Towl*, 12 Md. 550.

But if the promise of the defendant was such as is stated in this declaration, if it had been made first and directly to the plaintiff instead of being merely renewed, it would have been invalid and could not have sustained an action of *assumpsit*, because there was no consideration to sustain such promise. The promise made as stated in the declaration is, that the defendant would stop its train twice a week at the mill in consideration of the other side not insisting on the building and maintaining by the defendant of the switch at that moment; but it was expressly understood, that there was no abandonment by the other party of its right to demand the building and maintaining of this switch, whenever they pleased to make the demand. This promise is based on no consideration and is therefore *nudum pactum*. The plaintiff has neither compromised or surrendered any right, nor has he suspended any right except momentarily. He has by such a contract in no possible manner prejudiced himself or benefitted the defendant, It is like the case when A. in consideration that B. would make to him an *estate at will* promises. This is no valuable consideration, for that he may presently after the estate made determine it. See 1 Viner's Abr. 309; *Richardson* v. *Mellish*, 2 Bing. 229, (9 Eng. Com. L. R. 398.)

The judgment of the circuit court of Marshall, of July 3d, 1878, must be set aside, reversed and annulled, and also the verdict of the jury in the circuit court; and the order of the circuit court made August 8, 1877, reversing and annulling the judgment of the county court of Marshall, must be affirmed. And as said order gave to the plaintiff a right to amend his declaration, this case is remanded to the circuit court, with instruction to sustain the demurrer to the plaintiff's declaration, and dismiss his suit, unless within a reasonable time he files

an amended declaration, and with instructions to proceed with this case according to the principles laid down in this opinion, and further according to law; and it is adjudged that the plaintiff in error recover of the defendant his costs expended in this Court.

THE OTHER JUDGES CONCURRED.

JUDGMENT AFFIRMED.    CAUSE REMANDED.