## PITTSBURG, FT. WAYNE & CHICAGO RAILROAD COMPANY

v.

## SARAH A. RENO ET AL.

*Covenant by Grantee of Part of Certain Premises to Restore and Continue a Switch Connection with the Remainder Thereof—Suit for Breach of—Whether Covenant Runs with the Land—"Heirs" and "Assigns," not Mentioned—Joint Covenant—Parties—Misjoinder—Landlord and Tenant—Tenancy from Year to Year—Rights of Tenants—How far Injured Party is Required to Limit Liability of Wrong-doer—Evidence—Admissibility—Error without Prejudice.*

1. The common-law rule, that where the heirs of a covenantor are not mentioned the covenant will be binding only on him, his executors and administrators, does not apply to a real covenant running with land granted or demised, or to which the covenant is attached, to secure to one party the full benefit of the grant or demise, or to the other the consideration for which it was made.

2. A covenant by a grantee of one parcel of land for the benefit of other adjacent land of the grantor, will pass to a subsequent assignee of the latter tract.

3. While it is the duty of one injured from another's breach of a contract to make reasonable exertions to render the injury as light as possible, he is not required to surrender important and valuable privileges, or to take measures which are likely to involve himself in great and irreparable injury in order to diminish the liability of the wrong-doer.

4. In an action against the grantee of a portion of certain premises to recover damages for an alleged breach of its covenant to restore a switch

P., Ft. W. & C. R. R. Co. v. Reno et al.

connection and to continue to the covenantees the use thereof, the amount claimed being for damages to the grantors as owners of the remainder of said premises in use as a coal yard, with which said switch was to connect, and for damages to the business of the husbands of said owners as lessees of said yard, it is *held:* That the covenant in question is a covenant running with the land of the covenantees; that a reference to their heirs and assigns was not necessary to constitute it such a covenant; that said covenant is to be construed as perpetual; that the continuance to the covenantees of the use of such switch connection is the proper subject of a covenant real; that there is no misjoinder of actions; that the covenant, being with all the covenantees for the performance of a single duty, is joint and not several; that the plaintiffs have several interests, not in the covenant itself, but merely in the subject to which it relates; that the joinder of all the covenantees was necessary to the maintenance of any action on the covenant; that the distribution of the damages between the covenantees does not concern the defendant; that when the switch connection was removed the lessees were holding as tenants from year to year; that they had a right to continue in the enjoyment of their tenancy, not merely during the current year, but until such tenancy should be determined; that under the circumstances it was not their duty in order to diminish the defendant's liability to surrender their tenancy at the end of the current year; and that the admission in evidence of the record of a chancery proceeding for a specific performance of said covenant, though improper, could not have prejudiced the defendant.

[Opinion filed May 18, 1887.]

APPEAL from the Superior Court of Cook County; the Hon. ELLIOTT ANTHONY, Judge, presiding.

Statement by BAILEY, J. This was a suit brought by Sarah A. Reno, Charles A. Reno and Eugenia M. Little against the Pittsburg, Fort Wayne & Chicago Railway Company, to recover damages for a breach by the defendant of the covenants contained in the last paragraph of the following contract:

"Articles of agreement, made this twenty-eighth day of July, A. D. 1880, between Sarah A. Reno and Charles A. Reno, her husband, and Eugenia M. Little and Jacob H. Little, her husband, of Chicago, party of the first part, and the Pittsburg, Fort Wayne & Chicago Railway Company, party of the second part: Witnesseth, that the party of the first part, in consideration of the money to be paid and the covenants as herein expressed, to be performed by the party of the second part (the prompt performance of which payments and covenants being a condi-

tion precedent, and time being the essence of said condition), hereby agree to sell to the said party of the second part all those certain lots and parcels of land, situated in Chicago, County of Cook and State of Illinois, designated and described as follows, viz.: Lots thirty-two (32), thirty-three (33), thirty-thirty-four (34), thirty-five (35), thirty-six (36), thirty-seven (37), thirty-eight (38), thirty-nine (39) and forty (40), in block sixty-three (63), in School Section Addition to Chicago, in the County of Cook and State of Illinois, but excluding all improvements upon the same, and which are to belong to and are to be removed by said first party at or before the delivery of possession as hereinafter provided. And the said second party, in consideration of the premises, hereby agrees to pay to said first party for said premises the sum of thirty-five thousand dollars ($35,000), twenty thousand dollars ($20,000) thereof being estimated for said premises, and fifteen thousand dollars ($15,000) thereof as damages, as follows, to-wit: Twenty thousand dollars ($20,000) thereof on the execution of this agreement, the receipt whereof is hereby acknowledged, by said first party, and the remaining fifteen thousand dollars ($15,000), with interest from the date of this agreement until paid at the rate of six per centum (6 per cent.) per annum, to be paid upon and at the same time of the delivery by said first party to said second party of a good and sufficient warranty deed for said premises, except as to all taxes and assessments as hereinafter specified (the said Sarah A. Reno and Eugenia M. Little only warranting the title to said premises and Charles A. Reno and Jacob H. Little joining in said deed so as to convey all their interest in said premises), and it is further agreed between the parties hereto that said first party shall deliver to said second party the possession of the east twenty (20) feet of said premises within one week from this date, and the remainder of said premises within forty (40) days from this date; and that said second party shall pay, when due, all the taxes and assessments of every kind assessed or levied upon said premises subsequent to the year A. D. 1879, and in case it shall fail so to do, said first party may pay the same, and the same, with interest thereon, shall be repaid by said second party to said first party.

"And it is further so agreed that said first party shall execute and deliver said warranty deed to said second party, and said unpaid purchase money and interest shall be paid as soon as they shall remove from said premises a pretended claim to or against the same, of one Richard T. Crane, mentioned in a bill in chancery to enforce the same, now pending in the Circuit Court of said Cook County, wherein said Crane is complainant, and said first party are defendants, said first party thereby agreeing to use proper and prompt efforts to have said claim so removed and said suit disposed of.

"And it is further so agreed that if, for any reason, said pretended claim of said Crane should be finally established against said premises (said first party having the right of appeal to any court or courts), any sum to the extent of twenty thousand dollars ($20,000), so hereby received, which said Crane shall be decreed to pay by such final decree, after such appeal or appeals, if any, to said first party in said suit or any other suit, in order to establish or enforce said claim to or against said premises, shall be paid to said second party and not said first party, in satisfaction of said sum so hereby received by them under this agreement, and thereupon this agreement shall be cancelled and annulled and said first party absolved therefrom, and from all covenants herein contained, and in such case said second party may take the necessary measures to have said twenty thousand dollars ($20,000) so paid to it; but the remainder of any sum so decreed to be paid in said suit, or any other suit (if such shall ever be the case), shall be paid to said first party.

"And it is further so agreed, that if default shall be made by said second party in the payment as above provided, of said unpaid purchase money and interest, and such default shall continue for thirty days, this agreement shall be null and void at the option of said first party, or their heirs or assigns, and the aforesaid payment of twenty thousand dollars ($20,000) shall be forfeited and belong to said first party, and in which case the possession of said premises shall be surrendered to said first party, and in default of such surrender said first party may institute the proper proceedings to obtain such possession, or

at the election of said first party, or heirs or assigns, the cov-
enants and liability of said second party shall continue and
remain obligatory upon said second party, and may be enforced
by proper proceedings for that purpose.

"And it is further so agreed between the parties hereto, that
said second party shall, on taking possession of the premises so
hereinbefore described, restore all the switch connections now
existing between said second party and said first party, or any
of them, and continue to them the use of the same hereafter
as heretofore.

| " SARAH A. RENO, | [L. S.] |
|---|---|
| " CHARLES A. RENO, | [L. S.] |
| "EUGENIA M. LITTLE, | [L. S.] |
| " JACOB H. LITTLE, | [L. S.] |
| " PITTSBURG, FORT WAYNE AND | |
| " CHICAGO RAILWAY COMPANY, | [L. S.] |
| " By R. Biddle Roberts, Agent." | |

At the date of said contract Sarah A. Reno and Eugenia M.
Little were the owners in fee of lots numbered from 26 to 46
inclusive, of block 63, in School Section Addition to Chicago,
and their husbands, Charles A. Reno and Jacob H. Little,
copartners doing business under the firm name of Reno & Lit-
tle, were occupying said lots for a coal yard. Lots numbered
from 32 to 40, inclusive, fronted on Beach Street, and consti-
tuted a strip of land 100 feet wide and 230 feet long. The
main tracks of the defendant's railway, said tracks being used
by the defendant jointly with the Chicago & Alton Railroad
Company, ran in and along Beach Street adjacent to the lots
last mentioned, and for a number of years prior to the date
of said contract, said coal yard had been connected with said
railway by switch tracks, over which the defendant had de-
livered to Reno & Little, in their coal yard, all coal consigned
to them over the roads of either of said companies without
any switching charges.

Shortly after the date of said contract the defendant obtained
possession of the lots therein described, and proceeded to con-
struct two additional railway tracks upon the portion of said
lots adjacent to its main tracks. In doing so it tore up said

switch tracks but after the additional tracks were completed, switch tracks were again laid connecting the defendant's tracks with said coal yard, and thereafter the defendant delivered to Reno & Little coal consigned to them over said roads free of switching charges as it had previously done. This continued until August, 1881, when the defendant conveyed or caused to be conveyed to the Chicago, Burlington & Quincy Railroad Company the residue of said lots not occupied by said additional tracks, being a strip of land seventy feet in width, lying between said additional tracks of the defendant and Reno & Little's coal yard. The Chicago, Burlington & Quincy Railroad Company thereupon tore up said switch tracks and constructed seven railway tracks upon and along said strip of land, and refused thereafter to restore said switch connections between the defendant's tracks and said coal yard. Said company, however, offered to give Reno & Little a switch connection with its own tracks, and some time in 1885, constructed a switch track connecting its tracks with said coal yard, and delivered coal to said yard, charging Reno & Little from $2 to $4 per car for so doing.

Soon after the completion by the Chicago, Burlington & Quincy Railroad Company, of its said seven tracks, said Sarah A. Reno, Eugenia M. Little and their husbands, after endeavoring unsuccessfully to obtain from said railroad companies a restoration of said switch tracks connecting the defendant's railway with said coal yard, brought their bill in chancery against the defendant and said Chicago, Burlington & Quincy Railroad Company, to obtain a specific performance of the covenant in the foregoing contract relating to said switch connections, and obtained a decree compelling the restoration of said switch tracks and the continuance of the use of the same to the complainants, free of switching charges, which decree, on appeal to this court, was affirmed, but on a further appeal to the Supreme Court said decree was reversed and the cause remanded with directions to dismiss the bill for want of equity. C., B. & Q. R. R. Co. v. Reno, 113 Ill. 40. In compliance with the mandate of the Supreme Court said bill was afterward dismissed without prejudice to any remedies or actions

at law which the complainants or any of them might have concerning the matters mentioned in the bill. Pending said appeals said Charles H. Little died, and the present suit was brought by the plaintiffs as his survivors. At the trial before the court and a jury the issues were found in favor of the plaintiffs and their damages assessed at $35,000, and for that sum and costs the plaintiffs had judgment. The remaining facts are sufficiently stated in the opinion of the court.

Messrs. WILLARD & DRIGGS and DEXTER, HERRICK & ALLEN, for appellant.

Messrs. JOHN N. JEWETT and C. C. CLARKE, for appellees.

BAILEY, J. The first question to be considered is as to the proper construction to be given to the covenant upon which the suit was brought. Said covenant is in these words:

"And it is further so agreed between the parties hereto, that said second party shall, on taking possession of the premises so hereinbefore described, restore all the switch connections now existing between said second party and said first party, or any of them, and continue to them the use of the same hereafter as heretofore."

The defendant claims that this covenant was fully performed by restoring the switch connections between its tracks and Reno & Little's coal yard, after the construction of its two additional tracks, and delivering coal over the same to Reno & Little free of switching charges, down to the time the switch tracks were removed and the connection interrupted by the Chicago, Burlington & Quincy Railroad Company. To this view we are unable to assent. For a number of years prior to the execution of said covenant the switch connections between the defendant's railway tracks and Reno & Little's coal yard had been in existence, and during all that time the defendant had delivered to Reno & Little, free of switching charges, the coal consigned to them over its own road or that of the Chicago & Alton Railroad Company. Whatever may have been the defendant's legal duty in the premises, such was

its uniform practice. The plaintiffs, on selling to the defendant the lots in question, saw fit to exact as a part of the consideration, a covenant to restore the switch connections which were to be interrupted by the construction of railway tracks on the lots sold, and to continue to them the use of such switch connections thereafter in the same manner and upon the same terms as had been accorded to them in the past. It may be admitted that prior to the execution of the covenant the defendant was under no legal obligation to deliver coal at said coal yard without the exaction of reasonable switching charges, for even if that is so, the manifest design of the covenant was to change that which before was a matter of favor into a matter of contract. What the defendant had voluntarily chosen to do in the past, it agreed and bound itself to do in the future. There being no limitation in the covenant as to the time during which such use of the switch connection was to be continued to the covenantees, it should be construed, we think, to be perpetual. Other constructions are suggested, having some degree of plausibility, but an application of the rule, that a covenant should be construed most strongly against the covenantor, necessitates the construction we have adopted.

We are also of the opinion that said covenant is not a mere personal covenant, but a covenant running with the land of the covenantees as a benefit thereto. It is true the heirs and assigns of the covenantees are not mentioned or referred to in the covenant. That, however, is not necessary to constitute it a covenant running with the land. The common-law rule, that where the heirs are not mentioned the covenant will be binding only on the covenantor, his executors and administrators, does not apply to real covenants running with the land granted or demised, or to which the covenants are attached for the purpose of securing to one party the full benefit of the grant or demise, or to the other party the consideration on which the grant or demise was made. Morse v. Aldrich, 19 Pick. 499 ; Platt on Covenants, 65.

A covenant by a grantee of one parcel of land for the benefit of other adjacent land of the grantor, will pass to a subsequent assignee of the latter tract, and may be enforced by

him against the original covenantor. Woodruff v. Trenton
W. P. Co., 10 N. J. Eq. 489; Lydick v. B. & O. R. R. Co., 17 W.
Va. 427. In the case last cited a right of way through land
was granted to a railroad company, and in the deed, as the
consideration for such grant, the railroad company covenanted
with the grantor, his heirs and assigns, to build and forever
maintain a switch track from said railroad to a mill on the land,
and it was held that said covenant was a covenant real and run
with the mill. In Stark v. Waterhouse, 7 El. & Bl. 816, the
owners of a fulling-mill, dye-house, etc., were granted by deed
the right of draining refuse onto the land of another, and in
said deed they covenanted, in consideration of such grant, at
all times thereafter, to supply to the grantor, his heirs and
assigns, pure water sufficient for the consumption of his horses,
cattle, etc., and it was held by the court and admitted by
counsel that the covenant run with the land on which the ani-
mals were thus to be supplied with water.

The doctrine of the foregoing cases seems to be in harmony
with all the authorities, and applies to the case before us.
The covenant sued on was by the express terms of the con-
tract made a part of the consideration of the conveyance to
the covenantor of a portion of the land belonging to the cov-
enantees. The consideration recited in the contract is, "the
money to be paid, and the covenants, as herein expressed, to
be performed by the party of the second part." There is
nothing in the nature or character of the covenant which may
not properly belong to a covenant running with the land. It
stipulates, first, for a restoration of the switch connections
which, as the parties anticipated, were to be temporarily
interrupted, and, second, the operation of such switch connec-
tions by the defendant for the benefit of the covenantees, and
free of charge to them, by the use of its locomotive engines
and the personal services of its employes. The only doubt is
whether the second division of the covenant is the proper
subject of a covenant real. That it is, seems to be established
by the authorities. The following case, cited by Lord Coke,
may be referred to as fairly illustrating the principle involved:
" A, seized of the manor of D, whereof a chapel was parcel,

a prior, with the assent of his convent, covenanteth by deed indented with A and his heirs, to celebrate divine service in his said chapel weekly, for the lord of said manor, his servants, etc.    In this case the assignees shall have an action of covenant; albeit they were not named, for that the remedy by covenant doth run with the land, to give damages to the party aggrieved, and was in a  manner appurtenant to the manor." Coke on Litt. 385.

A question which counsel for the defendant have pressed upon our attention with great earnestness, relates to the nature and extent of the damages recoverable in this suit.    The plaintiffs, after alleging in their declaration a `breach by the defendant of its covenant to restore said switch connection and to continue to the covenantees the use of the same, allege damages to Sarah A. Reno and Eugenia M. Little, the owners of the lots, from a depreciation of their permanent and rental value, and also damages to Charles A. Reno and Jacob H. Little, from damage to their business as coal dealers, by reason of the failure of the defendant to transfer from its tracks into their coal yard the coal consigned to them free of switching or transfer charges.

At the trial the plaintiffs were permitted to give evidence to establish both species of damages, and damages of both species are, presumably, embraced in the verdict of the jury, though in what proportions the evidence furnishes no criterion to determine.    It is claimed that this is in substance a misjoinder of actions; that the convenant is several as to the covenantees, and that separate actions should have been brought by Reno & Little on the one hand, and the owners of the lots on the other, to recover damages for its breach.

We think that the position taken by counsel grows out of a misconception of the nature of the covenant and of the rules of law applicable to it.    While the interests of the several covenantees are variously affected by its breach, the covenant is not for the performance of several duties to each, but of one and the same duty to all.    Doubtless if it had been provided for the performance of one duty to Reno & Little and another separate duty to Mrs. Reno and Mrs. Little, it would have been

several, and separate actions might have been brought, but such is not the case. It is a mistake to suppose that there is any joinder here of two separate causes of action. The cause of action is one, viz., a breach of the covenant to restore the switch connections and to continue their use to the cove-nantees. This covenant runs to all alike and is therefore joint. The different covenantees have several interests, not in the covenant itself, but merely in the subject to which the covenant relates.

The true doctrine applicable to this question is laid down by Lord Kenyon in Anderson v. Martindale, 1 East, 497. That was a suit upon a covenant to and with A, his executors, administrators and assigns, and to and with B and her assigns, to pay an annuity to A, his executors, etc., during B's life. A having died, suit was brought on the covenant by his admin-istrator, although B, the other covenantee, was still living. His Lordship, in holding that the action could not be main-tained, said: "Here is a covenant to two to pay an annuity to one of them; shall both bring actions for the same interest where only one duty is to be paid? Which of them ought to recover for the non-performance of the covenant? The defend-ant is only bound to pay the annuity once. This is different, therefore, from the case put by Lord Coke, where the cove-nant is several for the performance of several duties to each; there the covenant shall be molded according to the several interests of the parties, and each shall recover for a breach so far as his own interests extend. It has been assumed in the argu-ment for the plaintiff that the covenantees had different inter-ests, but that is not so; the covenant was for the same thing; and though the benefit was only to one of them, yet both had a legal interest in the performance of it; and therefore the legal interest being jointly during the lives of both, on the death of one of them, survived to the other. If, indeed, the covenant had been to each by two different deeds, though for the same duty, there could not have been a joinder in action; but here the parties claim by the same title, and therefore the law coincides with the justice and convenience of the case."

In Sheppard's Touchstone, 166, the learned author, following

P., Ft. W. & C. R. R. Co. v. Reno et al.

the authority of Slingsby's Case, 5 Coke, 188, lays down the rule
as follows:   " In cases where the covenantees have, or are to
have, several interests or estates there, then the covenant is
made to and with the covenantees, *et cum quolibet eorum, aut
altero eorum;* in this case these words make the covenant sev-
eral: as if one by indenture demise Black-acre to A and
White-acre to B and Green-acre to C, and covenant with them,
and every of them, that he is lawful owner of all these acres;
in this case the covenant is several.   But if he demise to
them the three acres together, and covenant in this manner,
the covenant is joint and not several."

In Bradburne v. Botfield, 14 Mees. & W. 559, the proprie-
tors of certain coal mines, who each held certain undivided
interests therein, executed a lease thereof, according to their
several estates, rights and interests therein, to certain lessees,
reserving therein rent to said lessees respectively, and to
their respective heirs and assigns, according to their respect-
ive estates, rights and interests in the premises, the lessees
covenanting with all of said lessees, and each and every of
them, and each and every of their heirs, executors, admin-
istrators and assigns, to repair the premises and to sur-
render them in good repair to the lessors, their heirs and
assigns respectively, at the end of the term, and to work
the mines properly.   Suit was brought by a plaintiff who had
acquired title from one of the lessors to a moiety of the prem-
ises, the breach of the covenant alleged being a non-repair
and an improper working of the mines.   It appeared that one
of the covenantees was still living, and it was held that the
covenant was joint and not several, and that the surviving
covenantee ought to have brought suit.

Foley v. Addenbrooke, 4 A. & E. (N. S.), 197, was a suit
upon certain covenants in a lease, the facts being in most
respects similar to those in the case last cited; and the court,
holding that the covenant was joint, say: " We are of the
opinion that the demise being joint and the covenants upon
which the action is brought entire, and made with both the
lessors, the cause of action is joint, and that both the covenant-

ees ought to sue, though, as between themselves, their interests may be separate."

Many other authorities of like purport might be cited, but the foregoing we think will sufficiently illustrate the rule of law applicable to this question. The covenant here being with all the covenantees, to do a single act or class of acts, is necessarily entire and incapable of severance, and must therefore be held to be joint and not several. In order then to maintain any action upon it, all the surviving covenantees must be joined as plaintiffs, and it follows that all damages arising from its breach, which are recoverable at all, must be recovered in the same suit. Nor does there seem to be any legal obstacle in the way of such recovery. So long as the legal title to the covenant is in all the covenantees jointly, it follows as a necessary consequence that the legal title to all damages resulting from its breach is vested in them. True, the different covenantees are damnified in different proportions, and the damages suffered by Reno & Little, the tenants in possession, are different not only in their amount, but in their nature, from those suffered by the owners of the reversion. That, however, only affects their equitable rights as between themselves in the apportionment of the damages when the same are recovered.

It is urged that great inconvenience arises from this rule in cases like the present, where there is no criterion in the evidence or in the verdict or judgment, by which it can be determined how much the jury have assessed as the damages of the several parties. It is undoubtedly true, that should any disputes arise between the covenantees themselves, there might be very great difficulty in determining the proportion of the damages recovered which each should be entitled to receive. But we are unable to see how the defendant is in any way interested in the question of such distribution. Its interests are fully protected when it is ascertained that the damages recovered are no more in the aggregate than it was liable by its covenant to pay, and that the recovery is a bar to any further prosecution. How the damages are to be distributed is a matter with which it has no possible concern.

It is urged that the decision of the Supreme Court in Saf-

ford v. Miller, 59 Ill. 205, 215, is not in harmony with the rule above laid down. That was a suit upon an injunction bond conditioned for the payment to two obligees of all such damages as they might sustain by reason of the issuing of the injunction. The terms of this condition, as construed by the Supreme Court, limited the undertaking and the liability of the obligors to the damages which the obligees should *jointly* suffer, and it was accordingly he'd that a judgment based in part upon assignments of breaches alleging damages accruing to the obligees severally could not be sustained. The doctrine of the decision is, not that the obligation was several as to the obligees, so as to authorize suits by each obligee to recover his individual damages, but that such damages were not within the condition of the bond. We perceive nothing either in the decision or the reasoning of the court in any degree conflicting with the conclusions we have reached in this case.

Questions of some difficulty are raised upon the evidence adduced by the plaintiffs to establish Reno & Little's damages, and the rulings of the court in relation thereto. The evidence tends to show that one Abner Reeves, who died in 1875, was, at the time of his death, the owner of the ten lots embraced in the contract in question in this suit, and twelve other lots adjoining the same on the west. At that time the north half of said twenty-two lots was leased to the Chicago & Alton Railroad Company at a rental of $125 per month, or $1,500 per year. The south half was also rented to the Eureka Coal Company at a rental of $75 per month, or $900 per year. The Chicago & Alton Railroad Company, or its assignee, having surrendered possession of said north half, Reno & Little went into possession of it and paid rent therefor to the heirs of Abner Reeves at the same rate reserved in the lease to said company, and continued to occupy the same and pay rent therefor at that rate until some time in the year 1876. Mrs. Reno and Mrs. Little were two of the heirs of Abner Reeves, and some time during the year 1876 they bought out the other heirs, and thus became the exclusive owners of said lots. After their purchase, Reno & Little remained in possession of the north half as tenants of their wives, and paid them rent

therefor at the rate of $100 per month down to the date of the contract with the defendant. After the death of said Reeves, one Clark became the tenant of the south half of the lots, and continued to occupy the same until the spring of 1881. At the expiration of Clark's lease, Reno & Little took possession of what remained of the south half, after the sale of the ten lots to the defendant, thus including in their coal yard the twelve lots still owned by their wives, and continued to occupy the same, paying rent to their wives at the rate of $100 per month up to some time in August following, when the switch connections were interrupted. After the switch tracks were removed, they continued to occupy said lots down to June, 1885, when said Little died, but the evidence shows that no rent was paid by them after August, 1881. It does not appear that they held possession of said lots under any written lease, or that there was any express agreement between them and the owners of the fee fixing any specific term for the tenancy. On the contrary, the evidence shows affirmatively that there was no such lease, and no agreement fixing the duration of said tenancy.

Under these circumstances it seems clear that, at the time the switch connections were removed, Reno & Little were holding the lots occupied by them as a coal yard as tenants from year to year. Mr. Taylor, in his Treatise on Landlord and Tenant says: "The ordinary mode of leasing is for a specified term of years ; but if no particular time is limited for its duration, a tenancy from year to year will arise." And again : "Since the time of the Year Books, the courts have treated a general occupation by permission, no time being fixed for its continuance, as a tenancy from year to year, whenever the reservation of rent, or other circumstance, indicated an agreement for an annual holding. A tenancy of this description is not determinable at the end of any current year, unless a proper notice to quit shall have been previously served by the proper party intending to dissolve the tenancy upon the other ; in default of which the tenancy will run on from year to year until some event happens which, in contemplation of law, destroys it." Taylor on Land. and Ten., Secs. 54, 55.

See also, Ridgely v. Stillwell, 25 Mo. 570 ; Williams v. Deriar, 31 Mo. 13 ; Swan v. Clark, 80 Ind. 57 ; Lesley v. Randolph, 4 Rawle, 123 ; Thomas v. Wright, 9 Serg. & R. 87; Sullivan v. Enders, 3 Dana, 66 ; Boudette v. Pierce, 50 Vt. 212; Hall v. Wadsworth, 28 Vt. 410; Hunt v. Morton, 18 Ill. 75 ; 4 Kent's Com. 112.

Reno & Little being tenants of said premises from year to year, had a right to continue in the enjoyment of their tenancy, not merely during the current year but until the tenancy should be terminated at the end of that or some subsequent year by notice duly served on them by their lessors.    On the other hand it was within their power to put an end to their tenancy at the expiration of that or any subsequent year by service of like notice of their lessors.    In point of fact the tenancy was not terminated by either party prior to the death of Little, in June, 1885.

The plaintiffs gave evidence showing the damages to Reno & Little's business consequent upon the breach of said covenant by the defendant, from the date of the final interruption of the switch connections down to the date of Little's death. It is insisted that they are entitled to recover only such damages as accrued during the then current year, and that in fulfillment of the duty which the law imposes upon a party injured from another's breach of contract or tort, to make reasonable exertions to render the injury as light as possible, it was their duty to terminate their tenancy at the expiration of said year.

Undoubtedly the legal duty above referred to is reasonable and just.    As said by Selden, J., in Hamilton v. McPearson, 28 N. Y. 67, " The law, for wise reasons, imposes upon a party subjected to injury from a breach of contract, the active duty of making reasonable exertions to render the injury as light as possible.    Public interest and sound morality accord with the law in demanding this ; and if the injured party, through negligence or willfulness, allows the damages to be unnecessarily enhanced, the increased loss justly falls upon him."    See 1 Sutherland on Damages, 148, and authorities cited.

As illustrations of the rule, we may refer to persons who

are hired for service for a given term, and who are wrongfully discharged. The law imposes upon them the duty to seek other employment, and to the extent that they obtain it, or might do so, their damages will be reduced. A party claiming damages as a purchaser can recover no more than it would cost him, with reasonable diligence, to supply himself with the same property, by resort to the market or some other source or means of supply. Where a party, whose crops are exposed to injury through the default of another in not building or repairing a fence or in tortiously opening the same, is aware of the fact and the cause, and by a little timely labor and expense can avoid the damage, the law imposes upon him the duty of staying the injury, which was thus avoidable, when he is in a favorable situation to do it, and enforces the duty by confining his redress for the injury which was thus avoidable, to compensation for the necessary and proper means of prevention.

The rule, however, has never been carried to the extent of requiring the injured party to surrender important and valuable rights, or to take measures which are likely to involve himself in great and irreparable injury, for the purpose of diminishing the liability of the wrong-doer. The law has no such solicitude for the interests of wrong doers as to require innocent parties to submit to any such sacrifice. The result of the various authorities, where the rule is applied, seems to be that it is only where the party entitled to the benefit of a contract can protect himself from loss arising from its breach at an expense which is comparatively trifling, or with reasonable exertion on his part, that he is bound to take measures to prevent the injury and thus lessen the liability of the other contracting party.

In this case the termination by Reno & Little of their tenancy would, as we may well presume from the evidence, have involved them in loss greatly exceeding that to which they were exposed by the severance of the switch connections between their coal yard and the defendant's railway. It would have involved the surrender of a valuable leasehold estate, an estate which was none the less valuable and convenient to them

from the fact that their lessors were their own wives who had perfected their title to said lots for the express purpose of furnishing a place for their husbands to carry on their coal business. It would have involved the serious interruption and perhaps the total destruction of a valuable and lucrative business in which they had long been engaged, and in which their labor and capital were invested. It would be carrying the rule to a wholly unwarrantable extent, to require them to submit to sacrifices of this character for the purpose of relieving the defendant from the consequences of a breach of its covenant. We are of the opinion that, under the evidence, the plaintiffs were entitled to recover the damages to Reno & Little's business resulting from said breach, at least up to the date of Little's death. There was, therefore, no error in the admission of evidence of such damages.

Some complaint is made of the nature and scope of the evidence introduced for the purpose of establishing such damages, but we think that said evidence is subject to no valid objection, especially when taken in connection with the instructions of the court in which the true measure of damages was laid down, and which the jury must be presumed to have followed.

The court admitted in evidence, against the objection and exception of the defendant, the record in the suit in chancery brought by said covenantees to compel a specific performance of said covenant, and its admission is assigned for error. Said record consists of the bill, answer and replication, and a decree awarding a specific performance of the covenant in accordance with the prayer of the bill; and said record also shows that said decree was afterward affirmed by this court, but that on appeal to the Supreme Court it was reversed and the cause remanded with directions to dismiss the bill for want of equity, and that in obedience to that mandate said bill was dismissed by the court below at the costs of the complainants. It appears that the counsel for the plaintiffs, in offering said record in evidence, stated to the court that he offered it simply to show that during the pendency of those proceedings the covenantees were trying to have said covenant executed, and that

they were acting in good faith in remaining in possession of said premises up to the time the decree was finally reversed by the Supreme Court.

It appears sufficiently from what has already been said, that the facts which this record was offered to prove were wholly immaterial. The covenantees had a clear legal right to remain in possession and enjoyment of said premises during the entire period for which the plaintiffs sought to recover damages. Their good faith in so doing was not open to question, and their conduct in that behalf was in need of no apology. The record then was immaterial for the purpose for which it was offered, and was in our opinion incompetent as general evidence in the case. After the reversal the decree was to be held for naught, and had no more force and effect, either as a finding of the facts or the law, than if it had never been entered. The bill consisted of mere declarations of the complainants, and upon no principle of law could such declarations be received as evidence generally in their favor.

But while we are disposed to hold that the admission of the record in evidence was error, we are unable to see that the defendant was in any way materially prejudiced thereby. There was no substantial conflict in the evidence, and the plaintiffs' case was fully made out, both as to the right of recovery and the damages, by the other evidence. The statements of the bill seem in no material respect to add to or conflict with the case made by the other evidence, except in one particular. The bill alleges that, at the time the switch tracks were finally removed, Reno & Little were in possession of their coal yard under a lease from their wives, dated April 30, 1881, for a term of one year from May 1, 1881, to May 1, 1882, at a rental of $3,000 for the year. In so far as the bill stated facts which were proved by the other evidence, its admission in evidence could have done no harm to the defendant. In the particular above mentioned, in which it averred a lease terminating May 1, 1882, it was an admission in favor of the defendant. Under such lease Reno & Little's tenancy, as well as their right to damages, would have extended no farther than May 1, 1882, and the defendant sought to take

advantage of such admission by an instruction which was given to the jury at their instance, that if such lease was proved the plaintiffs could not recover any damages alleged or claimed to have accrued to Reno & Little after that date.

After such full and careful examination of the case as its magnitude and importance have demanded at our hands, we are of the opinion that there is no material error in the record. The judgment will, therefore, be affirmed.

*Judgment affirmed.*