# WHEELING.

## DOUGLASS v. RAILROAD CO.

Submitted January 29, 1902. Decided June 7, 1902.

1. DAMAGES—*Compensatory—Fencing R. R. Right of Way.*
   Compensatory damages cannot be recovered of a railroad company for breach of covenant to construct and maintain necessary cattle guards where the land owner fences off his remaining land.on both sides of the railroad right of way, and the land between such fences occupied by the right of way is not used for stock, and the division line between the land of the grantor and an adjoining owner is partly unfenced, so as to allow cattle to pass from the adjoining owner to the land occupied by the railroad, and it is not shown that cattle have passed along the railroad either way through the division line, and no damages shown unless it be possibly extra labor to attend cattle passing over a private crossing at the division line, no outlay being shown. (p. 528).

2. COMPENSATORY DAMAGES—*Breach of Covenant—Railroad Co.*
   Compensatory damages can not be recovered of a railroad company for breach of a covenant to fence its track, when the land through which the railroad passes is used, not for stock, but only for cropping, and no damages shown otherwise than

omission by the owner to graze stock on the land because of his fear of possible injury to it from trains, or loss of estimated profits by grazing over those from agriculture, which might have been realized, if fences had been made. (p. 532).

3. Action—*Covenant—Railroad Company—Limitation.*

   The statute of limitations will not bar action against a railroad company upon a covenant in a right of way grant to build and maintain a crossing or fence, the action being merely for such failure; but if actual damage result from such failure, then the statute will begin to run from the date of such damage in an action for compensatory damages. (p. 531).

4. Action Against R. R. Co.—*Covenant—Damages.*

   An action for compensatory damages can not be sustained against a railroad company for failure to build fences or cattle guards under an agreement· to do so merely for such failure; there must be actual loss from such failure as its proximate cause. (p. 532)..

5. Damages—*Not Based on Speculative Profits.* . .     .

   Mere speculative and conjectural estimates of profits which might have been made, or of the loss of gains and profits which might have been made, are not a legitimate basis upon which to fix damages. (8 W. Va. 569). (p. 533).

6. Breach of Contract—*Damages Nominal.*

   Where a mere breach of contract is shown, without actual damage calling for compensation, nominal damages may be recovered from the mere fact of such breach of contract; but if compensatory damages are demanded for actual damage, the plaintiff must in some way show, by evidence, facts and data affording means by which a jury can safely ascertain and fix the amount of damages. A jury can not go by mere arbitrary conjecture or estimate. (39 W. Va. 196; 40 *Id.* 583). (p. 533).

Error from Circuit Court, Wood County.

Action by Hiram Douglass against the Ohio River Railroad Company. Judgment for plaintiff, and defendant brings error.

*Reversed.*

H. P. Camden, for plaintiff in error.

V. B. Archer and McLuer & McLuer, for defendant in error.

Brannon, Judge:

Hiram Douglass made a deed to the Ohio River Railroad Company granting it a right of way through two tracts of land

in Jackson County, and Douglass brought an action of covenant in the circuit court of Wood County against the company to recover damages for the breach of a number of covenants contained in said deed, and recovered a verdict and judgment against said company. There were propounded to the jury a number of special questions upon the trial, requiring the jury to respond to the claim of damages for each breach of covenant assigned in the declaration, and the jury having, in answer to such questions, allowed damages for only two breaches of covenant, or rather under two special questions, we have to consider only the matters touched by those two particular questions. One of the tracts of land is referred to in the case as tract No. 1, the other as tract No. 2. The right of way deed contained a clause requiring the company to "make and maintain all necessary cattle guards and crossings on the land," and the declaration averred a failure to make such cattle guards and crossings, and one of the special questions directed the jury, in case it should award damages for failure of the company to construct and maintain cattle guards at or near the Brownell line on tract No. 1, to specify what amount was allowed by the jury for such failure, and the jury answered this question by finding an allowance of four hundred and sixty-six dollars and sixty-six cents for that failure. Can this finding be sustained? This tract No. 1 contained 315 acres. The railroad passed through it so as to leave about two hundred and ninety-five acres on the east side of the track, and twenty acres on the west side. At the time of the construction of the road, tract No. 1 was in enclosure and used for farming and grazing purposes, that part through which the railroad was made being through lands used for agricultural purposes. In 1886 Douglass built a fence clear through this tract from the Brownell line to the Wheatstone line, thus cutting off all his land on the west side of the railroad from it, all lying on the west side of the railroad including his residence, barn, garden and truck patch. After the date of the right of way deed mentioned above, Douglass made a second deed by which he conveyed another sixty foot strip of land running through the entire tract from the Brownell line to the Wheatstone line, binding on the right of way conveyed by his first deed on the east. The first deed, the one for the right of way dates 8th January, 1885, the second deed 17th August, 1886. The railroad was constructed in 1886 and 1887. This

strip was conveyed for depot purposes, and upon it a depot and stock yard were used by the railroad company and the public. Plainly it was the intention of Douglass and the railroad company that this strip of ground should lie open for the public use. Now, this strip of ground completely cut off the land of Douglass on the east side of the railroad from the railroad. It was the absolute property of the company. In conveying it Douglass reserved only a private right of way over it at the Brownell line. On the east side of this strip Douglass laid off town lots and sold some of them, thus manifesting plain intent that this strip should be a public street; but aside from this intention, his deed gave the company complete ownership and control over that strip. Douglass fenced off the balance of his land on the east side of the railroad, thus cutting it off from all of the balance of his land throughout its entire length. He put a gate in the fence on the east of the railroad strip. Thus he fenced off from the railroad all his land on the east and all his land on the west of the railroad, making a narrow tract of land between the two fences. At the Brownell line there was a division fence between the lands of Brownell and Douglass. When the railroad was built cutting through this fence there remained on the west side of the track about fifteen feet of it extending from the track to a public highway where it connected with a broken-down fence. When the railroad was constructed Douglass moved this fifteen feet of fence away to a point twenty feet from its former place and made it a part of the fence enclosing his dwelling house. The railroad did not touch the fence on its east side, nor that on its west side, only passing through that at the Brownell line. There were no cattle on the ground covered by the railroad and the sixty foot strip. There was no use for a cattle guard at the Brownell line so far as any use of the land between the fences on the east side and west side of the railroad required. There could be no damage as to that from the want of a cattle stop at the Brownell line. There is no evidence whatever of any invasion of cattle from Brownell's land upon the land of Douglass, and he proved no damage from that source. Moreover Douglass took away all the division fence between him and Brownell west of the track, and left a little of his land there unclosed and this would allow the passage of cattle. Considering the situation of the land I see no evidence of any damage to Douglass for the want of a cat-

tle stop in the Brownell line from the construction of the road up to the bringing of the suit, because the lands of Douglass were cut off on both sides of the railroad, and the land between their fences was not used for stock and needed no cattle guard. The situation of the land as made by Douglass himself, or rather its condition, dispensed with the need of a cattle guard in the Brownell line. What need of a cattle guard there? There were no cattle grazing on that part of the land of Douglass, and no damage from the invasion of it by stock from Brownell's land. And besides, Douglass removed the division fence west of the railroad track and thus left the land open, and a cattle guard on the Brownell line would not have stopped stock from going over that line. Where then is the actual damage as to the land between the fences of Douglass to the east and west of the railroad? A guard there was not required for the lands to the east and west because they were cut off by fences. It may be that Douglass would be entitled to a guard in the line between him and Brownell if his land along the railroad were used for agriculture, or grazing, but they are not, and we can not say that a guard would be necessary there owing to the use to which the land along the railroad was put, and the fact that the land which Douglass used was cut off by fences. As the right of way deed called for guards only where necessary, I do not see that a guard there is required in the true spirit of the right of way deed. Douglass claims two cattle guards at this point. One of them must be in the Brownell line, the other across the private crossing from the Brownell line. In no point of view can he demand this second guard, as a private crossing does not call for a cattle guard. *Clark* v. *Ohio River R. Co.*, 39 W. Va. 732. Another reason against any claim for a cattle guard at this private crossing is that the sixty foot strip conveyed by Douglass to the company does not reserve any right to Douglass to make a wing fence across it, up to any cattle guard. It can not be contended for a moment that it was ever intended that a fence should obstruct that sixty foot strip. The prior right of way deed could not be used to affect the later deed for the sixty foot strip; but the question is whether the later deed does not modify the former wherein the latter calls for a cattle stop at this point. We may say that Douglass would have right to one cattle stop in the Brownell line to keep cattle from going into Brownell's land while

being driven from land east of the railroad across the railroad to the west of it or back; but his could be but a mere nominal thing for the reason that the cattle would have to have a man in charge to keep them from going upon the railroad track and this sixty foot strip. As things have been since the construction of the railroad I can see no damage recoverable for the want of a cattle stop in the Brownell line. Douglass gave no evidence of damage for want of this stop except a general statement of extra labor in passing cattle over the railroad; but he gave no statement of expenditures or the number of cattle kept by him, or in what years, in fact, no data of definite character by which to fix or measure damages, and any estimate would be simply arbitrary. We might as well say five hundred dollars as one hundred dollars. The evidence must furnish means of fixing the amount of injury and measuring compensation for it. *Watts* v. *N. and W. Ry. Co.,* 39 W. Va. 196; *Robinson* v. *Railroad,* 40 *Id.* 583. The evidence afforded no ground for the allowance of compensatory damages for failure to make and maintain a cattle guard at the Brownell line. I notice that the sum found by the jury for the default of the company in this respect covers two cattle guards. Plainly there was no right to a second cattle guard, and any allowance for it entering in to the sum found would be erroneous, even if any could be allowed for one cattle guard. For want of evidence to form a basis for damages mere arbitrary opinions seem to have been adopted.

Evidence of mere opinions of witnesses was given to show that such cattle guards was necessary. I do not think this was admissible.

"If the facts can be placed before a jury, and they are of such nature that jurors generally are just as competent to form opinions in reference to them and draw inferences from them as witnesses, then the opinion of experts can not be received in evidence as to such facts. The opinion of a witness, who neither knows nor can know more about the subject than the jury, and who must draw his deduction from facts already in possession of the jury, is not admissible." It can not be claimed that the evidence of Vosburg was admissible under the law above stated found in *Overby* v. *Railroad,* 37 W. Va. 524. Vosburg's evidence was not admissible as an expert. Opinions of other witnesses as to necessity of cattle guards was not ad-

missible. "The opinions of witnesses should never be received, if all the facts can be ascertained and made intelligible to the jury, or if they are such as men in general are capable of comprehending and understanding." *State* v. *Musgrave,* 43 W. Va..672; 1 Greenl. on Ev. s. 440.; *Ferguson* v. *Hubbell,* 97 N. Y. 511. Opinion is not competent upon the question whether a railroad 'should be fenced at a certain place. *Railroad* v. *Hale,* 93 Ind. 79. The evidence to sustain this claim was insufficient under principles above stated and instruction specified in bill of exceptions No. 18 should have been given. The instruction specified in bill of exceptions 14 should not have been given. The court refused an instruction found in bill of exceptions 20 to the effect that the deed for the sixty foot strip gave no right to Brownell for cattle guards or wing fences from cattle guards across said strip, and that Douglass had no right to build, or require the company to build, cattle guards and wing fences over said strip. The court refused to give it as asked, but added the words "unless the jury believes that same or part thereof was provided for in agreement sued upon, and that said agreement is in force and effect in such respect." The addition is erroneous; that second deed spoke for itself. Its construction was for the court, not the jury. The whole construction as given seem to allow the jury to consider oral evidence to find whether the requirement of cattle guards in the first deed was still in force, whereas whether it had been done away with by the second deed was a question for the court. The court told the jury by this instruction that if the second deed did not provide for cattle guards and wing fences. they could consider the first deed on the question whether Douglass had a right to build cattle guards and wing fences over the said sixty foot strip. Surely he had not such right because the second deed gave absolute title to the company to that strip, and it could not be thus invaded by Douglass. Douglass reserved nothing from that strip but a crossing, and that exception shows that there was no other right reserved to Douglass. He could not close it by a fence or require the company to do so. He had no title left him in that strip. The first deed could not detract from the later deed without some exception in that later deed. The defendant asked an instruction that cattle guards are such contrivances as will prevent cattle from passing along the right of way into or out of an improved and

fenced field, and their purpose is to prevent cattle from passing into and out of improved and fenced fields along the right of way, and that if cattle guards would not have prevented cattle from entering or coming out of the improved fields of Douglass on tract No. 1 from the time the road was built to the institution of the suit, the jury should find for the defendant as to cattle guards referred to in the special question. The court refused this instruction asked, and added the words "and that the plaintiff sustained no damages for want of same." This addition is erroneous. If the cattle guards would not have prevented the passage of cattle, how could damage result from the want of cattle guards? If damage can not be attributed to the defendant's fault, how can he be chargeable? If two gates are open, through either of which cattle can pass, does the fault of keeping one open solely and alone cause the loss? This instruction bore on the question also whether the cattle guard was really necessary. The defendant asked an instruction found in bill of exceptions No. 22 that if the right of way and the sixty foot strip adjacent to the right of way through tract No. 1 were granted for station purposes, and fenced off from the adjoining land of Douglass on both sides of the track by fences on the division lines between the company and Douglass on the east and west sides of the track from Brownell's line to Wheatstone's line on the east side of the track, and through the length of the enclosure of Douglass on the west side, and if such fences were sufficient from the time they were built down to the suit to prevent cattle from going from the right of way upon the enclosed land of Douglass and to prevent cattle from coming out of his enclosed land on to the right of way, then cattle guards were not necessary at or near the Brownell line or the Wheatstone line, so long as said fences were there. The court refused to give the instruction in the form asked, but modified it by the addition "and if the jury further believe that the parties agreed upon a crossing at Brownell, but did not agree upon any cattle guards at Brownell line." There was no evidence that there was any agreement for cattle guards at that particular point. The question was whether, under the right of way, in the condition in which the land then was, a cattle guard was really necessary; and whether Douglass had a right to cattle guards after his second deed conveying the sixty foot strip to the company; and whether after an agreement, which the evi-

dence tended to establish, that there was to be a street along the east side of the depot grounds bounding town lots which Douglass sold, the parties could have contemplated that the land was to be closed or encumbered with fence and cattle guards. The modification is objectionable on the score that there was no evidence to show any agreement such as that mentioned in the modification. The court may have meant to put to the jury the question whether the first deed did not create an agreement for cattle guards; but if so that question was a legal question, not to be left to the jury. Furthermore, surely the right of way deed gave only one cattle guard at that point, and did not give another cattle guard across the crossing from the Brownell line. And it seems to me that if the fence named in the instruction were sufficient up to the date of the suit to prevent cattle from passing as put by the instruction there could be no damage, except merely nominal damages, even though there were an agreement to build cattle stops. If there were no damage, how could there be a recovery? If those fences were sufficient for the purposes stated, as long as they stood the cattle stops were not necessary. Cattle stops are to prevent actual damage. I think the instruction should have been given in the form asked. In any view the modification could not apply to a second cattle stop at the private crossing.

I do not think the action was barred by limitation because the contract was continuous, to build and maintain cattle stops.

The jury found six hundred and thirty-three dollars and thirty-three cents damages for the failure of the company to construct fences and under-crossing on tract No. 2. The deed for right of way bound the company to build and maintain fences on both sides of the railroad and also make an under-crossing. The company contends that the suit is barred by limitation. I do not think so, because the duty was both to build and maintain fences, that being a never ending duty. I do not see how the court can say that the act of construction is a distinct act, and because that, viewed singly, would be barred, the company would only be liable for failure to maintain the fences. only the cost of maintenance. We cannot separate construction from maintenance, and say that only the duty of maintenance is beyond the statute of limitation. Maintenance of a fence cannot be accomplished, unless the fence has been constructed; the

one duty goes along with the other, and we will not seperate them.

But I do not see that omission to make fences or cattle guards alone calls for any damage, certainly not for compensatory damages. If there could be an action for nominal damages simply for such omission, as I suppose there can be, I do not see how it would be barred under a covenant to build and maintain them; but when actual loss occurs from that omission as the proximate cause, limitation runs from the date of the loss, as to compensatory damages, and the date of the construction of the road, or when the fences or guards should have been made is immaterial.

We think that the plaintiff showed only a right to nominal damages, not compensatory damages, because he showed no actual loss from the omission to build and maintain fences and crossings, no loss computable in law. The fencing and crossing were only for use if the land was used for grazing. It had no grass upon it. The plaintiff neither put cattle upon it, nor appears to have had any cattle to put upon it. He used it every year for grain. He had no fencing on two sides of the field. It very plainly appeared that he really did not desire to use the land for grazing. Why does it so appear? Because though the company did build fences three years before this suit began, good fences, as the plaintiff admits, he did not put a hoof of stock upon the land, but kept on cropping it. His whole action shows that as the land was first class Ohio river bottom land, he preferred to use it for grain. As he had no cattle there how did he suffer any loss, and where is the justice of paying him damages when he showed no loss? If he had had cattle there, they could have got water from Mill creek and a drain on the land. He drained and tiled the land for agricultural purposes. The company, it is true, did not comply with the letter of its bond, and is liable, to nominal damages. Such failure of duty will not alone give right to compensatory damages. There must be both a broken duty and an actual loss there from a computable loss, a measurable loss, not one merely conjectural, or that can be guessed at.

"If the company fails to perform an agreement to fence, and animals are killed by reason thereof, the measure of damages is not what it would cost to erect the fence, but the value of the animals killed or injured or other damage done. Or, in other

words, the company will be liable for all damages which proximately flow from its failure to perform its contract duty." 3 Elliott on Railroads, s. 1188. There must be actual damage done to warrant compensatory damages. 12 Am. Enc. Law 1073.

Douglass made profits from this land every year by cropping. Evidence was admitted to prove that by grazing the land he could have made a certain sum more yearly than by graining the land. This evidence was improper and unavailing, because it proposed an improper basis for an allowance of damages. Profits by grazing, or any other business to be carried on in future, is dependent on numerous contingencies, and any estimate of future profits can only be conjectural, speculative, simply guess work. This process of getting at damages is not allowed by law: *Beatly Lumber Co. v. Western Union Tel Co.* (1902) cases there cited. The United States Supreme Court in *Howard v. Stillwell Co.*, 139 U. S. 199, held that expected profits from grinding wheat and selling its flour could not be taken into consideration in an action for failure to finish a mill at a time agreed upon.

Douglass claimed that he did not put cattle on the land from fear that they would be killed by trains. Loss from that cause would be purely conjectural. Such loss, though possible, cannot be considered where we have to assess damages as actual, based on actual loss. The cattle might not have been hurt. If hurt, when hurt, the company would have to pay their value. Shall we make it pay for cattle not hurt, not even on the premises? Again, the evidence discloses no certain criterion for assessment of damage. A jury must have definite evidence by which to find a certain sum as compensation for actual loss before it can render a verdict for compensatory damages. For a broken contract merely it can find nominal damages, but not compensatory; for the very term compensatory damages implies that there must be actual loss before compensation can be given, and there must be definite basis given by the evidence upon which a jury can define and fix the amount of the loss, otherwise any assessment is without law and against law. If the plaintiff can not show such a basis it is his misfortune, his evidence fails to show a loss of such substantial, tangible cast as that we can take hold of it and weigh and fix it in dollars. A jury is never permitted to grope in the dark and merely surmise, approximate or guess at damages. *Watts v. N. and W.*

*Railroad,* 39 W. Va. 196; *Guinn* v. *Railroad,* 46 *Id.* 151. Had any stock been killed for want of fences or perished for want of a crossing; or if the plaintiff had shown any special actual loss, he could recover; but as it is, where is his real loss? As there were no fences, we do not see that the want of a crossing could be a basis of damages, even if there had been cattle on the land. Therefore we are compelled to say that the evidence is not of that character to justify the verdict. It is against law touching the measurement of damages.

Under these principles it was improper to allow Douglass to answer the question given in bill of exceptions 5 as to what, in his judgment had been his damages from the failure to fence the railroad right of way on tract 2, in view of its usefulness for grazing. This question called for mere opinion, and that not based on any facts by which damages could be measured. And the land was not used for grazing. The evidence of Hardpole excepted to in bill of exceptions 6 was improper. He was asked to say whether Douglass had been damaged, taking into consideration the usefulness of the land for grazing. The question called for mere arbitrary estimate, founded on no certain facts, and gauged by a test that did not exist under the evidence in the case, the use of the land for grazing.

It was error not to exclude evidence specified in bill of exceptions 10, that Douglass was afraid to pasture cattle on land because he was afraid that they would be killed by trains. I have above stated reasons against this evidence. The instruction given for the plaintiff noted in bill of exceptions 16 was improper. It told the jury that if Douglass was prevented from pasturing stock by reason of the company's failure to fence and make an under-crossing for stock, the plaintiff was entitled to recover such damages as the jury might believe from the evidence the plaintiff had sustained. No evidence presented a foundation for this instruction. What prevented him from pasturing the land? If he had done so, and had suffered loss, then there could be recovery. As he did not so use the land, there is no rule or principle by which to fix damages except by guess. And besides, the instruction combined both the failure to fence and make a crossing in the estimation of damages, and thus give damages for both, whereas, there being no fences, the absence of a crossing could not be an element in fixing damages. And the instruction ignores the fact that Douglass did,

after the grant of the right of way, convey to another company the lower part of the tract, where the crossing was to be, reserving no right to cross.

The instruction given for the plaintiff preserved in bill of exceptions 17 told the jury that if the company failed to make the fences and crossing, that fact alone called for such damages as the jury might believe from the evidence had been sustained by the plaintiff. The instruction was improper. The mere failure to make a fence and crossing alone, without attendant loss ascertainable from some certain principle or basis, and not from mere guess, would not legally call for damages. On principles above stated the instruction was improper.

The court refused an instruction given in bill of exceptions 23 to the effect that as the plaintiff had conveyed to another company a portion of the lower part of tract No. 2, not reserving right to cross over said portion, to get to an under-crossing on the lower end of the tract, it was not necessary, after such conveyance, for the company to keep an under-crossing on the lower end of the tract, but the company might abandon and fill up the crossings from the time of such conveyance. The court modified it to the effect that it was not necessary to keep open the under-crossing on that portion of the lower end of the tract conveyed to the other railroad company. I hardly think this instruction was proper. It depends on the question whether, in fact, the call for such crossing was limited to the part sold. This depends upon the nature of the tract of land. I do not see that the call for the crossing was limited to the small piece of land conveyed away by Douglass. I do not see that his failure to reserve a passage over that piece to a crossing elsewhere would absolve the company from maintaining a crossing elsewhere. The company claims that it commenced to make a crossing under the grade on this piece, and Douglass objected to its being made there, and that this absolved the company from further duty to make a crossing elsewhere. It does not seem so to me. What mattered it to the company where the crossing was, unless a change of location would entail unreasonable expense? Wherever Douglass elected to have the crossing, he would be bound by such election.

For these reasons we reverse the judgment, set aside the general and special verdicts, and remand the case for new trial.

*Reversed.*