# CHARLESTON.

### Hurxthal *v.* Boom Co.

Submitted September 5, 1902. Decided April 4, 1903.

1. Covenant.

In order that a covenant be a real covenant running with land it must be in a grant thereof, or some estate or interest therein. There must be privity in estate between the parties. It is not sufficient that it merely concerns land. (p. 92).

2. Covenant—*Agreement.*

In an agreement one party covenants with the other to maintain and repair dams to supply water to the mill of the covenantee, and to prevent trash from gathering in a mill-race conveying the water. This is a personal, not a real covenant. **(p. 93).**

3. Covenant—*Land.*

A covenant not in nature and kind a covenant real, but provid-

ing that the heirs, devisees and assigns of the covenantee shall have its benefit, which covenant benefits, and does not charge. land, can be enforced by an a ienee deriving the land from the covenantee. (p. 93).

4.    COVENANT—*Estate—Owner—Decree.*

One purchasing at a judicial sale lands sold from a person is a privy in estate with such former owner, and is entitled to the benefit of a real covenant running with the land and bound as *res judicata* by a decree binding a former owner. (p. 94).

5.    ADMINISTRATOR—*Commissioner—Creditor.*

In a suit by an administrator under section 7, chapter 86, Code 1899, to convene creditors of a decedent, when a creditor presents his demand before a commissioner taking an account of debts for allowance against the estate, a decree allowing or disallowing such demand is *res judicata* as to the creditor, and also the representatives of the estate and a party purchasing land of the estate under the decree. (p. 94).

6.  ·  COVENANT—*Administrator—Contract.*

In a suit by an administrator to convene creditors of a decedent under section 7, chapter 86, Code 1899, one claiming a demand against the estate under a contract with the decedent binding one to maintain dams to supply water to a mill, presents it in such suit for allowance, and it is resisted by the administrator and heirs of the decedent on the ground that the covenant was broken, and that the party was not entitled to compensation for maintaining such dam for that reason, a decree allowing such demand is conclusive to show that such agreement was not broken in the lifetime of the decedent, as between the covenantor and an assignee of the land benefitted by the covenant to show comp'iance with the covenant in the lifetime of the decedent. (p. 96).

7.    COVENANT—*Damages.*    L

A covenant to maintain and repair dams to supply water for a mill.    One breach of it will not be a total breach during its whole term and abrogate the contract and entitle the covenantee to recover permanent damages, past and future, in one action. (p. 97).    "

8.    CONTRACT—*Damages.*

Where there is a breach of a contract and the party suing for damages has failed to do an act which he can do reasonably, and thus enhances the damage originating from such breach of contract, he is not precluded by his negligence from all recovery, but the increased damage caused by his negligence is to be excluded in assessing damages—his negligence goes in mitigation of damages. (p. 98).

9. NEGLIGENCE.

    The subject of negligence by a party injured by a breach of contract discussed. (p. 100).

10. CONTRACT—*Damages.*

    In an action for breach of contract the damages recovered must be such as will give, and only such as will give, compensation for the actual loss directly flowing from the breach of the contract. (p. 102).

Error to Circuit Court, Greenbrier County.

Action by Josie M. Hurxthal against the St. Lawrence Boom & Lumber Company. Judgment for plaintiff. Defend-

*Reversed.*

JOHN W. HARRIS, for plaintiff in error.

WILLIAMS & DICE, for defendant in error.

BRANNON, JUDGE:

Josie M. Hurxthal, brought an action of covenant against St. Lawrence Boom and Manufacturing Company in the circuit court of Greenbrier County and received a verdict and judgment for $4,000, and the company sued out this writ of error.

Ben Hurxthal owned a flour and grist mill on Greenbrier river, which was supplied with water by a race fed by a dam in the river near the head of the race. The said company owned a saw mill which was also fed by said mill race at a point some distance above the Hurxthal mill. The said company had booms in the river above the mill race for catching logs. The logs sawed on the company's saw mill were floated down the river to the head of the mill race and then down the mill race to a point a little above the saw mill, at which point the logs left the mill race and were floated to the mill on a lateral channel leading from the mill race to the river. Near the point where this channel entered the river the channel was divided into two parts by an island, and across the two mouths of this channel, which channel is called a log pond, there were two small dams erected to prevent the water which flowed into the mill race at its head from going into the river through the log pond, not only to keep the pond from being too shallow, but also to keep it from being lost from the grist mill further on down.

These dams had been erected by the Boom Company. On the 13th day of June, 1894, said Boom Company and Ben Hurxthal entered into an agreement under seal by which the said company bound itself to "maintain and keep in good repair the said dam in Greenbrier river" and the two small dams at the foot of the log pond for a period of five years. The said river dam was to be maintained at the height which should give the same head of water as if erected at the site of an old dam which stood just below the head of said mill race, and had been built at the latter point 7 feet high from the surface of the water at low stage—the object being to make the dam equivalent to a 7 foot dam on the old site. The agreement further bound the company to maintain in good repair the two dams at the foot of the log pond at such height as should prevent the water in the mill race from being drawn off through the channels closed by the said two small dams. The agreement gave the right to the company to maintain the tres- tle that crossed the race leading to the said grist mill at the point where the trestle then stood, and also to maintain the bridge across the race which then stood across it, and to use said trestle and bridge, and bound the company to keep the trestle and bridge free from such trash as migh impede the flow of water through the race to said grist mill. For main- taining said dams the agreement bound Ben Hurxthal to pay the company seventy-five dollars per year, and said "the obliga- tion to pay the same shall, in addition to being a personal one, be a covenant running with the land and binding upon said Ronceverte Flour Mills, mill-race and water power into whose- soever hands they may pass." The agreement contained the language: "This agreement shall continue in force for the period of five years next ensuing the date thereof, and at the option of the said party of the second part, his heirs, represen- tatives or assigns, to be exercised by notice in writing to said party of the first part given within the said five years, shall continue in force ten years from date thereof." Several years after the date of the agreement Ben Hurxthal died and Josie M. Hurxthal as his administratrix brought a chancery suit to convene all the creditors of said decedent's estate, ascertain their debts and sell his real estate, including said grist mill property, to pay such debts, and under a decree in that case the

said grist mill was sold on March 16, 1899, and purchased by Josie M. Hurxthal, the plaintiff in the action of covenant. On the 13th of June, 1899, Josie M. Hurxthal gave a written notice to the said company that she would extend the operation of the said agreement for the additional period of five years as provided therein. She paid seventy-five dollars to said company for the maintenance of said dams for one year after 13th June, 1899. In her bill in the said chancery suit brought by Mrs. Hurxthal as her husband's administratrix to convene her husband's creditors she specified various debts against her husband's estate and its lands as stated that "the St. Lawrence Boom and Manufacturing Co. claims a debt against said Ben Hurxthal, which was contested by him." The said company presented its claim in that suit before the commissioner for $300.00 against Hurxthal's estate for compensation under said agreement for the maintenance of said dams for four years during the life time of the said Hurxthal. The estate of Hurxthal contested this demand of the company and took evidence to repel it and the company took evidence to sustain it. The commissioner disallowed the claim. Then the company filed its answer to the bill setting up the said agreement and claiming the said $300.00 for keeping up the said dams for the said four years, the said company having been made a formal party defendant to the bill filed by said administratrix. The case was referred back to the commissioner to report the debts of said estate and before him both sides took evidence to sustain and repel such demand, and the result was that the commissioner again rejected said demand as a claim against the estate; but upon an exception to his report by the company the court allowed the said demand and decreed it as a debt against Hurxthal's estate, but only as a general debt, and not as a lien on the grist mill property. Then the company appealed the case to this Court because of the refusal of the circuit court to decree its debt as a lien under said agreement and accord to it its proper preference over other debts and this Court declared it such lien, as will be seen in 45 W. Va. 584. Afterwards, as first above stated, Josie M. Hurxthal brought said action of covenant against said company claiming that the company had not kept the covenant contained in said agreement of 13th June, 1894, but had broken the same in failing to maintain the said

dam across Greenbrier river and said two dams at the foot of said log pond at the height stipulated by said agreement, and in suffering and permitting debris to accumulate in the mill-race at the points where the company's bridge and trestle crossed said race, thereby preventing the flow of a sufficient quantity of water to the plaintiff's grist mill to operate the same.

A question going to the very root of the case, because involving the very right of the plaintiff to sue upon the agreement on which her suit is based, arises upon the plaintiff's first instruction saying, that if she, before 13th June, 1899, gave the company written notice that she elected to extend the agreement of 13th June, 1894, for five years after 13th June, 1899, then the plaintiff had succeeded to the rights of Ben Hurxthal under that agreement. This involves the question whether the covenants in said agreement binding the company to maintain the dams as therein provided, and not to suffer or permit the accumulation of trash in the mill-race, are covenants real running with the grist mill property and enuring to the benefit of the plaintiff as its owner derivately from Ben Hurxthal, and thus entitling her to sue for an infraction of that agreement; or are mere personal covenants binding the company only as such, and not authorizing the plaintiff, as successor in ownership of the grist mill, to sue for the infraction of the agreement. "A covenant is said to run with the land when either the liability to perform it or the right to enforce it passes to the assignee of the land." 8 Am. & Eng. Ency. Law 134. When the company made those covenants it passed no estate in the mill property to Hurxthal. The company and he were strangers in estate. To create a covenant real there must be a privity in estate between the parties—otherwise it is simply a personal obligation, neither binding nor benefitting the land in the hands of heirs, devisees or assigns. *Lydick* v. *Railroad,* 17 W. Va. 427; *Trans. Co.* v. *Pipeline Co.* 23 *Id.* 631; 2 Minor 715. "It is not sufficient that the covenant is concerning land, but to make it run with the land there must be à privity of estate between the parties, and the covenant must have relation to an interest created or conveyed, in order that the covenant may pass to the grantee of the covenantee." 8 Am. & Eng. Ency. L. 147. "A covenant does not run with the land unless contained in a grant thereof, or of

some estate therein." *Fresno Canal Co.* v. *Rowell,* 13 Am.
St. R. 112.  It is true that this covenant has one element of a
covenant real in the fact that it benefits the estate of the cov-
antee, the mill property; but it lacks another material element,
privity in estate, as the company conveyed no interest in the
mill, but merely made a personal obligation on the company
touching the mill.  So this covenant is not in its inherent
nature, a real covenant.  But does its language make it such?
The agreement makes the obligation of Hurxthal to pay for
maintaining the dam run with the land.  It seems under law
above stated this would not perhaps make it a covenant real;
but it was clearly a lien in its terms as an equitable mortgage.
There is no such provision as to the covenants made by the
company, and we infer it was not so intended.  But there is
the clause in the agreement giving the right to the assignsees
of Hurxthal to continue the agreement for five years.  What
is the effect of that clause?  It seems to be well settled in law
that if a covenant is not, in nature and kind, a real covenant,
the mere declaration of the parties that it shall run with the
land will not make it a real covenant, though so stated in the
document.  8 Am. & Eng. Ency. L. 134;  2 Washb. R. Prop.
secs. 1203, 1205;  *Gibson* v. *Holden,* 56 Am. R. 146, 149.  Un-
der this authority I do not see how a covenant not one of such
nature as to run with land could by declaration in the agree-
ment be made such, so as to place an obligation on the land in
the hands of subsequent owners; but this covenant is one not
placing the burden on the Hurxthal mill, but benefitting it,
and the company agreed that benefit should go to the use of
the assigns of Hurxthal.  The point is not without difficulty;
but it does seem to me that under these circumstances, this
consent of the company, while it would not place a burden
on the company property, would give the mill property of Hurx-
thal the benefit of the covenant, so as to enable the plaintiff
as alienee to sue upon it.  I do not know that it will add any-
thing to the strength of the position, in a legal point of view,
to rely upon the fact that the company accepted from the plaintiff
pay for one year's maintenance of the dam.  If the covenant
does not give her right, it would be doubtful whether an oral
agreement would do so under the statute of fraud, as being
a contract not performable in one year, though the statute is not

pleaded. This is not material, however, because I hold that the plaintiff is entitled to sue for a breach of the covenant occurring during her ownership, by reason of the clause giving the benefit of the agreement to the assignee of Ben Hurxthal. There can be no question but that the plaintiff is a privy in the estate with Ben Hurxthal, and an "assign" within the meaning of that word used in said agreement; for she purchased at the judicial sale, which by law cast upon her the entire estate of Ben Hurxthal, and she is as much an assignee of the property from Ben Hurxthal as if he had conveyed it to her. 8 Am. & Eng. Ency. L. 146; Rawle on Cov. sec. 213; Tiedman R. Prop. sec. 860; *My-Gatt* v. *Coe,* 24 L. R. A. 850. So the plaintiff can recover if the defendant failed in its covenants after the plaintiff acquired the property, 16 March, 1899, the date of her purchase at the court sale. Upon these questions of fact, in view of a new trial, we decline to pass. Therefore plaintiff's first instruction is good, and defendant's 1 and 2 bad, because denying right to sue.

Another question arising in the case comes from the claim of the company that the matter in controversy in this suit was adjudicated finally, and the plaintiff barred by reason of the decree in the suit of the administratrix mentioned above brought to convene the creditors of Ben Hurxthal's estate. The bill brought before the court for adjudication the question whether the company had a valid debt against the estate. Though the bill presented this matter very indeffinitely, yet it presented it and made the company the defendant, and it could not have presented it for any other purpose than for adjudication. I apprehend that a bill of that character need not specify the debts against the estate with particularity which would be called for in suits of a different character, the suit in question being only one to bring the assets of a decedent before the court for adjudication, and the creditors and their debts come in before the commissioners without pleading or formal issue. Section 7 of chapter 86, Code, makes such a suit the vehicle of relief to all creditors whether parties or not, or whether their debts are specified or not in the bill. The section provides that evidence respecting the claim of any creditor may be taken just as if such creditor were made a formal party and his rights set up in the bill. The refference to a commissioner enables that cred-

itor to present his claim, and present his evidence and gives
to that evidence just the same effect as if the matter were set·
up in the bill. In this instance the company was made a formal
party. Even if it were not so, I doubt not but that the company
would have been barred of its demand, had it not presented it
in the case, because section 9 of that chapter so operates. For
stronger reasons would it have been so barred as it was made a
party and its claim presented to the court. If it would be a bar
on one side, it ought to be also on the other. The answer of the
company set up its demand as arising out of that agreement
with full defiteness for compensation for the maintenance of
the dams for four years at seventy-five dollars per year. Much
evidence was taken on both sides upon the question whether the
company was entitled to that compensation. Depositions were
taken on the side of the estate to show that the company had
not maintained the dam of the requisite height to give sufficient
water to the grist mill, and had not been maintained in the
manner demanded by the written agreement; and depositions
were taken by the company to repel this charge and to show that
the agreement had been complied fully. Thus a specific contro-
versy arose before the commissioner. It is true this controversy
was not made by formal issue in pleading; that is never done or
very rare in such a suit; but the bill, the answer, the depositions
show what that controversy was. The company demanded
$300.00 for maintaining the dam, and the estate sought by re-
coupment to entirely or partially defeat the demand by reason
of the breach of the agreement by the company. There could
be no other issue. The commissioner rejected the company's
debt. Why? Only because he thought the contract had not
been complied with by the company. There could be no other
reason, since the contract provided that Hurxthal was to pay
a fixed amount, and there was no claim of payment, and noth-
ing could defeat the demand under the facts shown, but breach
of the agreement. If the company complied with its contract,
it was entitled to its debt; if it had not then its demand would
be defeated by recoupment in whole or in part. The court held
the company entitled to its full demand, and thus inevitably
decided that there was no cause based on the company's failure
to comply with its agreement to deny its demand. The estate
could have omitted to make defence by recoupment and have

sued in an action of law, and the decree then would not have bound the estate; but it presented this defence and took much evidence to sustain it. The matter was fully litigated and passed on by the court. Is the matter after long litigation in that suit again open? That decree settled that the dams had been maintained and repaired at the height and in the manner required by the agreement, and that it had not been violated up to the death of Ben Hurxthal. The plaintiff as a privy in estate under him is bound by this decree as showing that there was no default or violation of the agreement before Hurxthal's death. The plaintiff must prove a breach later not a mere continuance of the state of things before his death.

It is contended that the declaration seeks damages including time during Hurxthal's life; but I construe it as claiming damages only accruing during the plaintiff's ownership. I do not think there was any call for a new assignment of damages during plaintiff's ownership. The declaration is limited to the plaintiff's ownership. I therefore think that the defendant's instructions 4 and 5 saying that said adjudication precluded the plaintiff from any recovery are bad. That adjudication only applies to Ben Hurxthal's lifetime. It was a contest between his estate and the company. I think that defendant's instruction 6 is bad. It declares that the decree would preclude recovery, unless the evidence showed that there was some failure of the defendant to keep the covenant which did not exist when the evidence was taken in the chancery case, but which occurred afterwards. The objection to this instruction is that it goes back only as far as the taking of evidence, instead of the date of Hurxthal's death. If there was a breach after his death which entailed damage on the plaintiff after she became owner, she could sue. Defendant's instruction 8 is good, except that it fixes the date of the commissioner's report as the date up to which the decree operates as *res judicata*, instead of the date of Hurxthal's death.

The plaintiff has given instruction 2 saying that if the plaintiff succeeded to the rights of Ben Hurxthal under the agreement, and that the dam in Greenbrier river was not high enough to give a seven foot head of water as provided in the contract, and that it was not substantially complied with to furnish such head of water, then there was a total breach of the agree-

ment in that respect, and "the plaintiff may elect to treat the entire contract as abrogated, and has right to recover whatever damages she has sustained, if any, since March 16, 1899, up to the present time, excluding the time during which Pierpoint and Ammonet had a lease of the mill; also all future damages which they believe must necessarily result from such total breach from the present time down to the end of the five years' renewal of said contract—that is, to June 13, 1904." This instruction is erroneous. It also told the jury that if there had been such total breach they must find for the plaintiff, and in estimating damages must exclude from consideration the plaintiff's evidence tending to show partial breaches occurring since the institution of the action, such as allowing debris to collect against the trestles and the bridge across the race, and leaving open the gates at the foot of the log pond. This material instruction treated the agreement as an entire contract and allowed the jury to say that if once broken as to the dams and trash, it was broken in toto and for the whole time of its duration, and that entire or permanent damages for that duration, for the past and future, might be at once recovered. If this be so, then it would follow that the decision in the chancery suit would operate as a complete bar to any recovery. But I do not think so, as I have above stated and limited the operation of the chancery suit. The instruction allows a recovery clear through till the 13th June, 1904, for damages before and after this commencement of the suit. Such is not the character of this contract. The plaintiff is entitled to only such damages as were actually received from the breach of the agreement. That was error. There may be a recovery of the entire or permanent damages in case of injury permanently and durably affecting the estate in value, and the declaration must show an intent to claim for such permanent injury. Our cases hold that if the cause of injury is in nature permanent, and a recovery for such injury would confer license of the defendant to continue it, entire damages may be recovered in a single action; but where the cause of injury is not permanent in character, but such that it may be supposed that the defendant would remove it rather than suffer at once a heavy recovery for entire permanent and lasting damage, which the injury might inflict if permanent, the entire damages including fu-

ture damages cannot be recovered in a single action, but actions may be maintained repeatedly as long as the cause of injury continues to inflict damages. *Watts* v. *Railroad,* 39 W. Va. 196; *Henry* v. *Railroad,* 40 W. Va. 235; *Guinn* v. *Railroad,* 46 *Id.* 151; *Pickens* v. *Coal Co.,* 41 S. E. 400; *Hargreaves* v. *Kimberly,* 26 *Id.* 787. It is very plain that injury such as the plaintiff imputes to the defendant in this case is not permanent, inflicting enduring and irremovable, damages, but may be recurrent, occasional and in its nature curable by human effort and labor, in the removal of the cause. If the dams were too low in fact or were not repaired, but were leaking, or trash accumulated in the race at the trestle, the injury or damage could be stopped by the use of money and labor. It would not be justice to charge the defendant irretrievably with heavy damage, mulct it at once and for the whole period of the contract with damage before its infliction, as if on the conclusive presumption that the defendant would not, after one recovery, remove the cause of the injury. There could be no recovery in this case for damage arising after the bringing of the suit. If continued, the plaintiff must resort to other actions. For these reasons plaintiff's instruction 3 allowing the jury in estimating damages to consider the difference in rental value of the mill from March 16, 1899, to June 13, 1904, with the dams in the condition in which they were and have been since March 16, 1899, up to the present time, and the rental value for the same period if a dam had been maintained at proper height, is bad. For the same reason plaintiff's instruction 5 allowing a recovery of permanent damages is also bad. And so is the instruction 6 bad as to clauses one and four relating to special findings, because they allow the jury to find a total breach of the contract for the whole period of its duration from a prior failure on the part of the defendant to observe it.

The court gave plaintiff her instruction 7 saying that if the plaintiff had negligently permitted gravel and mud to accumulate in the mill-race or had been guilty of any other negligence or act whereby the supply of water to her mill had been diminished, such negligence could only be considered in fixing the amount of damages and would not excuse the defendant from performing its agreement. This seems to be based on sound law. It is claimed that mud and gravel and mud were deposi-

ted by a drain running into the race in times of heavy rain, and suffered negligently by the plaintiff to remain in the race, and that any failure of full supply of water arose wholly or partly from the impediment to the flow of the water caused by such gravel and mud, and that this wholly exculpates the company from liability. In cases of tort where the plaintiff is chargeable with any contributory negligence it totally forbids recovery; but this does not seem to be the law in cases where a breach of contract is a factor in the production of the injury. In such cases the party contracts to do, or not do, a certain thing, and if he violates his contract, and thus causes injury he must answer in damages. If the plaintiff, by negligence in doing what he ought to do to lessen the damages, adds to them that negligence goes to mitigate damages. "The acts and negligence of the plaintiff which have enhanced the injury resulting from the defendant's act or neglect may be shown in mitigation of damages. The defendant is liable for the natural and proximate consequences of his violation of contract and of his wrongful acts; but if the plaintiff has rendered these consequences more severe to himself by some voluntary act which it was his duty to refrain from; or if by his neglect to exert himself reasonably to limit the injury and prevent damage, in the case of which the law imposes the duty, and thereby he suffers additional injury from the defendant's act, evidence is admissible in mitigation to ascertain to what extent the damages claimed are to be attributed to such acts or omissions of the plaintiff. If he omit to use his opportunities and does not reasonably exert himself to lessen the damages which may result from the defendant's act, he is not entitled to compensation for the injury which he might and ought to have prevented, except to the extent of proper compensation for such measures or acts of prevention as the case required and were within his knowledge and power. The measure of his duty in this regard is ordinary care and diligence." 1 Sutherl. on Dam, section 155. We find in 3 Parsons on Contracts, 189, the following: "Still it is sometimes difficult to draw the line between what are and what are not the natural consequences of an injury. Always, however, if the consequences of the act complained of have been increased and exaggerated by the act, or the omission to act, of the plaintiff, this addition must be

carefully discriminated from those natural consequences of the act of the defendant, for which alone he is responsible. If the plaintiff chooses to make his loss greater than it need have been, he cannot thereby make his claim on the defendant any greater." On page 206 (193) we find this: "But from the elements which make up the actual loss are to be eliminated those causes of loss which spring, not merely from the plaintiff's conduct, but also from his omission to do what he might by reasonable endeavors have done to lessen the loss." "A party suing for breach of contract is required to do what he reasonably can, and improve all reasonable opportunity, to lessen the injury and reduce the damages caused by the breach." *Sherman* v. *Leonard,* 46 Kansas 354, (26 Am. St. R. 101, 105). The same principles will be found in *Milwaukee* v. *Duncan,* 87 Wis. 120, (41 Am. St. R. 33), and *Sullivan* v. *McMillen,* 53 *Id.* 239, 37 Fla. 134. Are there any cases in which a defendant's breach of contract will be totally excused by reason of the negligence of the plaintiff? There are such cases. If the plaintiff's very act or omission is the prime cause of his damage; if it proceeds from the plaintiff's act breaking his contract and causing the injury, the plaintiff could not recover; but if the defendant breaks his contract and injury follows, the plaintiff may recover notwithstanding his act or omission contributes to continue or enhance the damage. In 2 Parsons on Contract 798 (681) we are told that the application of the law on this subject to the facts is difficult, and it is there laid down that "If the plaintiff's own negligence was an immediate and a principal cause of the injury, without which it probably would not have occurred, it is certain he cannot recover damages. But, though the plaintiff is proved to have been somewhat negligent, and to have contributed to the injury by his negligence, he may nevertheless recover, if he can show gross or far greater negligence on the part of the defendant, and also that this negligence was the principal and proximate cause of the injury. Language is sometimes used from which it might be inferred that if both parties are negligent, and the defendant more so than the plaintiff, the plaintiff should recover. The rule may be incapable of exact definition. But we think it is not law, that if both parties are negligent in a nearly equal degree, but the defendant is, on the whole, the most negligent of the two,

the plaintiff shall prevail. To sustain the action, a greater than
a merely perceptible difference must exist between the two de-
grees of negligence." Applying these principles to this case
it seems to me that if the defendant did by failure to keep the
covenant by some act or omission after the death of Hurxthal,
entailing damage to the plaintiff's mill after her purchase,
then the defendant would be liable for such actual damage;
but that any negligence of the plaintiff in allowing sand, gravel
or mud to remain in the race diminishing the flow of water
to the mill can be shown in mitigation of damage. What is
attributable to her negligence should be excluded from the
damage. Therefore I think plaintiff's instruction 7 is not ob-
jectionable. Defendant's instruction 9 propunds the proposi-
tion that the agreement of 13 June, 1894, "is based on the as-
sumption that the then existing dam furnished the height of
water therein specified and required, and that the same being
signed by Ben Hurxthal, the presumption arises that he consid-
ered such head of water given by said dams." I do not think
this instruction is good as we cannot say that the execution of
the agreement by Hurxthal amounted to the admission put by
the instruction. The very object of the agreement moving
him to sign it may have been to secure such a dam. Still we must
remember that the adjudication in the chancery suit forecloses
the question of height of the dam, and fixes their height accord-
ing to the contract on the 8 March, 1898.

Defendant's instruction 10 saying that the decree in the
chancery cause shows that the height of the dam was in contro-
versy therein is good under the principles above stated upon
that subject.

Defendant's instruction 12 is not good so far as it says that
the contract is based on the assumption that the dams existed
at its date at the lower end of the log pond then furnished the
head of water required by it; but the instruction is good in say-
ing "if the jury believes the said dams then furnished sufficient
water, and if the said defendant has maintained said dams to
the same height they were on June 13, 1894, and has kept
the trash and rubbish from the bridge and trestle across said
race, so as not to obstruct the flow of water, and use due dil-
ligence in repairing said dams when necessary, they must find

for the defendant," except as to the date June 13, 1894, the proper date being 8th March, 1898.

Defendant's instruction 13 declares the adjudication in the chancery suit extends to the final decree in May, 1899, after the mandate of the Supreme Court reached the circuit court. I do not think the instruction good. I think that decree, for the purposes of this case, relates to the date of the death of Hurxthal. I shall say nothing upon the subject of excessiveness of damages in view of a new trial, further than to say that they were assessed on an improper basis and made greatly too large because they cover the whole time from the plaintiff's purchase down to 13th June, 1904. As to what damages the plaintiff suffered, if any, we do not say, nor whether the defendant is guilty of a breach of the contract. These matters are left for the new trial. It is very certain that in an action for a breach of contract the measure is more strictly confined than in cases of tort, the primary and immediate result of the breach are alone to be looked to. In Wood's Mayne on Damages, p. 14, section 12. Punitive damages are confined to torts, and even then damages must be compensatory only as a general rule. *Talbott* v. *W. Va. Cent. & P. R. Co.,* 42 W. Va. 560; *Bodkin* v. *Arnold,* 48 *Id.* 108. Damages must not go beyond fair compensation for actual loss sustained. They cannot be punitive in action on contracts. 3 Parsons on Contracts 179, (169) ; 8 Am. & Eng. Ency. L. 632, compensation for actual loss is the test, the standard of damages in actions on contract. 1 Sutherland on Dam. sections 12, 75. Damages for breach of contract in excess of actual compensation are unwarranted and a ground for new trial. *Rowland & Co.* v. *Ross,* 40 S. E. 922; *Dougless* v. *Railroad,* 51 W. Va. 523. Neither in tort nor contract do damages go beyond such as are the reasonable and probable consequences of the act complained of, except in some cases of tort. *Peters* v. *Johnson,* 50 W. Va. 644.

*Reversed.*

The plaintiff cross-complains that the Court erred in allowing the record in the chancery suit, including depositions of witnesses, to go in evidence; but as shown above it was admissible.

The evidence of John Briscoll, a share holder in the defend-

ant company, was not admissible as to any conversation or transaction with Hurxthal; but that part of his evidence was excluded and disclaimed by the defendant. I do not see that any conversation between Briscoll and Bailey as to leveling estimates of the height necessary to build the dam before it was built can be admitted. But I do not see any objection to evidence that leveling was done by Bailey.

I do not think under principles above stated that defendant's instruction given by the court is objectionable. It declared that the record in the chancery case shows that the height of the dam was in controversy, and was the matter inissue between the estate of Hurxthal and the company.

The plaintiff complains of the action of the Court in admitting as evidence minutes of the defendant company in 1881, to show Ben Hurxthal's connection with the company at that time, and that the stockholders of the company claim under Ben Hurxthal, and to show his acquaintance with the business and properties of the company. The minutes being in his handwriting. Hurxthal had parted with all interest in the company before the dam was built and before the agreement, and I do not see that this evidence is relevant to the case or relates to it with sufficient closeness to authorize its admission.

We therefore reverse the judgment, set aside the verdict and I grant a new trial, and remand the case.