No. 13-0427 - John N. Kenney v. Samuel C. Liston

**FILED**

**June 4, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, dissenting:

"The object of tort law is to provide reasonable compensation for losses[.]" *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W.Va. 492, 504, 345 S.E.2d 791, 803 (1986). To that end, "'[t]he general rule in awarding damages is to give compensation for pecuniary loss; that is, to put the plaintiff in the same position, so far as money can do it, as he would have been [in] if ... the tort [had] not [been] committed.'" *Kessel v. Leavitt*, 204 W.Va. 95, 187, 511 S.E.2d 720, 812 (1998) (quoting 5C Michie's Jur. *Damages* § 18, at 63 (footnote omitted)). In this case, the majority has turned this fundamental rule on its head by allowing a jury to award compensable damages based on fictitious evidence that bears no relationship to the plaintiff's actual losses. In such regard, the majority has determined when a tortiously injured person receives medical care for his or her injuries, that individual's recovery for the medical expenses incurred will be based upon an artificially inflated number that exists only in the medical provider's billing system rather than the actual amount the medical provider willingly accepts as full payment for the services rendered. The majority's conclusion that medical bills that include a "write-off" or discount–an amount no one pays–constitutes the "reasonable value" of the medical services rendered defies both logic and common sense. Therefore, I dissent.

1

Long ago, this Court recognized that "the very term 'compensatory damages' implies that there must be actual loss before compensation can be given[.]" *Douglass v. Railroad Co.*, 51 W.Va. 523, 533, 41 S.E. 911, 916 (1902). Yet, the majority's decision today allows a plaintiff's damages to be based on the amount a medical provider wishes it could charge for a particular service, not the amount necessary to put the plaintiff in the same financial position he or she was in before the tort occurred. The "write-offs" or discounts at issue here are not sums for which the plaintiff has incurred any liability because these are amounts which the medical provider never actually expects to be paid and never will be paid. Because neither the plaintiff, nor anyone on the plaintiff's' behalf, pays the "write-offs" or discounts, no loss occurs. Therefore, these amounts should not be recoverable.

Precluding recovery for the "write-offs" or discounts does not contravene the collateral source rule. The purpose of the collateral source rule is to prevent the jury from discounting a plaintiff's damages based on the fact that the plaintiff's bills have already been paid by someone else. As this Court has observed, "[t]he collateral source rule normally operates to preclude the offsetting of *payments* made by health and accident insurance companies or other collateral sources against the damages claimed by the injured party." Syl. Pt. 7, *Ratlief v. Yokum*, 167 W.Va. 779, 280 S.E.2d 584 (1981) (emphasis added). "Because no one pays the write-off, it cannot possibly constitute *payment* of any benefit from a collateral source." *Robinson v. Bates,* 857 N.E.2d 1195, 1200 (Ohio 2006); *see also Kastick v. U-Haul Co.*, 740 N.Y.S.2d 167, 169 (N.Y. App. Div. 2002) (stating that "'write-off'. . .

2

is not an item of damages for which plantiff may recover because plantiff has incurred no liability therefor"); *Moorhead v. Crozer Chester Med. Ctr.*, 765 A.2d 786 (Pa. 2001) (finding collateral source rule does not apply to amounts written off by insurer since those amounts are never paid by collateral source), *abrogated on other grounds by Northbrook Life Ins. Co. v. Commonwealth*, 949 A.2d 333 (Pa. 2008).

The majority reasons that these "write-offs" or discounts are protected by the collateral source rule because the plaintiff received the benefit of her bargain with the insurance carrier as well as a gratuitous benefit arising from the bargain with the medical provider. The fallacy of this reasoning is easily demonstrated.

The majority concludes that the "write-off" or discount is a benefit the plaintiff received from her insurer because she paid the premium and her insurer extinguished her liability for the full price of her medical care through a combination of cash payments and the negotiated "write off" or discount. However, the majority ignores the fact that the plaintiff was never liable for the inflated bill because at the time the charges were incurred, the medical provider and the insurer had already agreed on a different price for the services rendered. Furthermore, the "write off" or discount does not primarily benefit the plaintiff and to the extent that it does, it was not intended as compensation for the plaintiff's injuries. Rejecting the same reasoning employed by the majority in this case, the Supreme Court of California explained that

> Insurers and medical providers negotiate rates in pursuit of their own business interests, and the benefits of the bargains made accrue directly to the negotiating parties. The primary benefit of discounted rates for medical care goes to the payer of those rates–that is, in largest part, to the insurer.
>
> Nor does the insurer negotiate or the medical provider grant a discounted payment rate *as compensation for the plaintiff's injuries.* . . . [S]ellers in almost any industry may, for a variety of reasons, discount their prices for particular buyers, but a discounted price is not a payment. . . . Nor has the value of damages the plaintiff *avoided* ever been the measure of tort recovery. And even when the overall savings a health insurance organization negotiates for itself can be said to benefit an insured indirectly–through lower premiums or copayments, for example–it would be rare that these indirect benefits would coincidentally equal the negotiated rate differential for the medical services rendered the plaintiff.

*Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1144 (Cal. 2011) (internal quotations omitted).

Likewise, the "write-off" or discount is not a gratuitous provision of medical services because the medical provider agreed before treating the plaintiff to accept a certain amount in exchange for its services. The amount constitutes the medical provider's price that the plaintiff and her health insurer were obligated to pay. In *Howell,* the Court found that the gratuitous services exception to the rule limiting recovery to a plaintiff's economic loss "has no application to commercially-negotiated priced agreements like those between medical providers and health insurers," observing that

> [m]edical providers that agree to accept discounted payments by managed care organizations or other health insurers as full

payment for a patient's care do so not a gift to the patient or insurer, but for commercial reasons and as a result of negotiations. . . . [H]ospitals and medical groups obtain commercial benefits from their agreements with health insurance organizations; the agreements guarantee the providers prompt payment of the agreed rates and often have financial incentives for plan members to choose the providers' services. . . . That plaintiffs are not permitted to recover undiscounted amounts from those who have injured them creates no danger these negotiations and agreements will disappear; the medical provider has no financial reason to care whether the tortfeasor is charged with or the plaintiff recovers the negotiated rate differential. Having agreed to accept the negotiated amount as full payment, a provider may not recover any difference between that and the billed amount through a lien on the tort recovery.

*Howell*, 257 P.2d at 1139-40 (citations omitted). Thus, the "write-off" or discount is not a collateral payment or benefit that is subject to the collateral source rule.

Given the current complexities of health care pricing structures, it is simply absurd to conclude that the amount billed for a certain procedure reflects the "reasonable value" of that medical service. Like retailers who raise the price of their goods by twenty-five percent before having a ten percent off sale, medical providers utilize the same sort of tactic to ensure a profit. In fact, "[b]ecause so many patients, insured, uninsured, and recipients under government health care programs, pay discounted rates, hospital bills have been called 'insincere,' in the sense that they would yield truly enormous profits if those prices were actually paid." *Howell*, 257 P.2d at 1142 (citation omitted).

One authority reports that hospitals historically billed insured and uninsured patients similarly. Mark A. Hall & Carl

5

E. Schneider, *Patients As Consumers: Courts, Contracts, and the New Medical Marketplace*, 106 Mich. L.Rev. 643, 663 (2008). With the advent of managed care, some insurers began demanding deep discounts, and hospitals shifted costs to less influential patients. *Id.* This authority reports that insurers generally pay about forty cents per dollar of billed charges and that hospitals accept such amounts in full satisfaction of the billed charges. *Id.*

As more medical providers are paid under fixed payment arrangements, another authority reports, hospital charge structures have become less correlated to hospital operations and actual payments. The Lewin Group, A Study of Hospital Charge Setting Practices i (2005). Currently, the relationship between charges and costs is "tenuous at best." *Id.* at 7. In fact, hospital executives reportedly admit that most charges have "no relation to anything, and certainly not to cost." Hall, *Patients As Consumers* at 665.

*Stanley v. Walker*, 906 N.E.2d 852, 857 (Ind. 2009). Thus, to conclude that a medical bill that does not reflect the "write-off" or discount that will ultimately be given to the payer constitutes the reasonable value of the medical service rendered ignores the reality of modern medicine economics.

It is difficult to conceive how allowing the plaintiff to present to the jury fictitious evidence of amounts paid for medical services, while preventing the tortfeasor from challenging that evidence, serves the interests of justice. The petitioner in the instant case sought to introduce the amounts actually paid for the medical services *not* in an effort to establish a *per se* limit on the respondent's medical damages, but rather as evidence of precisely what the majority's new syllabus point prescribes–the reasonable value of those

6

services. What more probative evidence of the reasonable value of the services could there be than the negotiated and paid rate for the services? What more could a defendant offer to rebut the prima facie presumption established in West Virginia Code § 57-5-4j? Are we to blindly accept the fiction that hospitals and other medical providers routinely and as a matter of freely-negotiated contracts accept *less* than the reasonable value of their services?

The collateral source rule should not be extended to permit plaintiffs to receive compensation for medical expenses that were never paid by anyone. The rule was intended to prevent tortfeasors from unfairly receiving a discount on the damages they are required to pay merely because a plaintiff was wise or fortunate enough to have procured insurance coverage. Limiting the amounts which can be recovered as damages for medical expenses to those amounts actually paid, as opposed to fictitious amounts generated by medical providers to ensure they can still make a profit after giving a substantial discount, does not thwart the rationale behind the collateral source rule. If tortfeasors are automatically required to compensate plaintiffs for their medical expenses at the highest possible price, regardless of the actual amounts paid, those costs will inevitably be passed on to the public through higher insurance premiums. "Tort law . . . is not designed to be a Las Vegas game of chance; it serves no useful purpose to turn the tort system into a lottery where everyone pays high insurance premiums so that enormous windfalls can be allocated randomly." *Roberts*, 176

W.Va. at 504, 345 S.E.2d at 803-04. Accordingly, I respectfully dissent from the majority's

decision in this case.[1]

---

[1]While I do not disagree with the majority's decision with regard to the other assignments of error, I would have found it unnecessary to address those issues and ordered a new trial based on the faulty compensable damages award.